Commonwealth *v.* Kirk, Appellant.
Commonwealth *v.* Skok, Appellant.

Argued March 13 and 14, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, PARKER, RHODES and HIRT, JJ.

*O. K. Eaton,* with him *J. Dress Pannell,* for appellants.

*Samuel Handler,* with him *Carl B. Shelley,* District Attorney, and *Earl V. Compton,* for appellee.

OPINION BY KELLER, P. J., July 19, 1940:

The defendants were indicted, tried and found guilty (1) of the charge (No. 303 January Sessions, 1939) of conspiracy with Warren Van Dyke and others to misuse the power and influence of the office of the Secretary of Highways of the Commonwealth of Pennsylvania for the personal aggrandizement of the defendants; and (2) of the charge (No. 304 January Sessions, 1939) of conspiracy with H. H. Temple and others to extort bond business and moneys from contractors engaged in the performance of highway construction contracts, and from insurance agents and brokers writing bonds insuring such performance, by the misuse and abuse of the powers, authority and influence of the office of the Chief Engineer of said Department of Highways, and others. Each of them was sentenced on the first charge to pay a fine of $2500 and costs of prosecution, and on the second, to pay the costs of prosecution. The defendants severally appealed from each sentence.

The assignments of error may be grouped under three heads: (1) Overruling the respective motions to quash, (2) refusing to direct verdicts of 'not guilty'; (3) overruling the respective motions in arrest of judgment. The discharge of the defendants' rules for a new trial was not assigned for error; hence we shall not discuss the reasons presented in the motions for new trial. They are, however, adequately discussed in the opinion of President Judge REESE of the 9th Judicial District, who, by direction of the Supreme Court, presided at the trial. As to the motions in arrest of judgment, it is well settled that insufficiency of evidence gives no support to a motion in arrest of judgment: *Com. v. Jones,* 303 Pa. 551, 553, 154 A. 480. Judgments can

be arrested in criminal cases only for causes appearing upon the face of the record: *Com. v. Bateman,* 92 Pa. Superior Ct. 53, 56; *Com. v. Grant,* 121 Pa. Superior Ct. 399, 183 A. 663; *Com. v. Long,* 131 Pa. Superior Ct. 28, 30, 31, 198 A. 474. The questions before us may, therefore, be boiled down to two: (1) Did the court err in refusing to quash the indictments? (2) Did the evidence in the record require a directed verdict of acquittal? We shall discuss them in that order.

(1) OVERRULING MOTIONS TO QUASH.

These prosecutions had their origin in the grand jury investigation, conducted in Dauphin County, the seat of the State Government, into the acts and conduct of certain public officials, which was considered and passed upon in various phases by the Supreme Court in *Dauphin County Grand Jury Investigation Proceedings, (No. 1),* 332 Pa. 289, 326, 335, 2 A. 2d 783; *Dauphin County Grand Jury Investigation Proceedings (No. 2),* 332 Pa. 342, 346, 2 A. 2d 804; *Dauphin County Grand Jury Investigation Proceedings, (No. 3),* 332 Pa. 358, 2 A. 2d 809. As a result, Honorable PAUL N. SCHAEFFER, President Judge of the 23d Judicial District, consisting of the County of Berks, was directed by the Supreme Court to lay aside his regular judicial duties and proceed to the 12th Judicial District, comprising the County of Dauphin, with Harrisburg as the County seat, there to preside over and take control of the proposed investigation by the Grand Jury of Dauphin County, with the same power and authority as is vested in the law judges of the 12th Judicial District.

During the course of that investigation, evidence came into the possession of the district attorney, which, in his opinion, warranted an inquiry and investigation into whether these defendants in conjunction with Warren Van Dyke, then Secretary of Highways (now deceased) and others had conspired to misuse the power and influence of the office of Secretary of Highways for

128

the personal aggrandizement of the defendants; and together with H. H. Temple, then Chief Engineer of the Department of Highways, had conspired to extort bond business and moneys from contractors engaged in the performance of highway construction contracts, and from insurance agents and brokers writing performance bonds on such contracts. Upon his petition setting forth the foregoing, an order was made by Judge SCHAEFFER, presiding over said grand jury investigation, amplifying the scope of the matters originally directed to be investigated by it, so as to include the conduct of these defendants and others in connection with the obtaining and writing of performance bonds on State Highway construction contracts. On the conclusion of its investigation, the grand jury, in a report made on February 27, 1939, designated as its Second Presentment, recommended that the matters so found by them and reported be referred for consideration to the current grand jury.

Pursuant thereto, the district attorney, with leave of the court first obtained, presented these indictments to the regular, current January 1939 grand jury, which, on March 9, 1939 returned a true bill against Kirk and Skok on the indictment to No. 303, and a true bill against Kirk, Skok and Temple on the indictment to No. 304.

On May 1, 1939, the defendants moved to quash the indictments on the following grounds:

(1) Because of the presence during the taking of the testimony before the *Investigating* Grand Jury of two Special Assistants to the District Attorney, appointed pursuant to the order of the Court of Quarter Sessions of Dauphin County, who participated in the examination of witnesses; for the reason (a) that they were not lawfully appointed, and (b) thereby the secrecy of the Grand Jury was invaded, and the constitutional and statutory rights of the defendants were violated.

(2) The secrecy of the Grand Jury was also violated in that three other special assistants to the District Attorney, alleged to have been unlawfully appointed as aforesaid, were assigned to work in conjunction with the grand juries making the investigations and considering the indictments, and had access to and did obtain information concerning the proceedings before each grand jury.

(3) The secrecy of the Investigating Grand Jury was further violated, in that two stenographers regularly, by turns, took stenographic notes of the testimony before such grand jury and dictated them onto wax cylinders in dictaphone machines; and two dictaphone operators transcribed such testimony into typewriting, making several copies thereof, which were accessible, with the consent of the District Attorney, to other persons who examined them in whole or in part.

(4) The District Attorney and his representatives took an undue interest in the actions of the Investigating Grand Jury and the Indicting Grand Jury, exceeding their authority.

(5) The safeguards surrounding the Grand Jury were breached by said appointments, intrusions and conduct of those purporting to be special assistants of the District Attorney, which influenced the Grand Juries making the investigation and considering the indictments respectively, in believing that the Commonwealth desired the finding and return of the indictments.

(6) The indictments were not based upon a complaint made before a committing magistrate, etc., and the offenses charged were not of such a nature, nor was there such pressing necessity, as to require or justify the extraordinary intervention of the court and an investigation and indictment respectively by a grand jury without a prosecution before a magistrate.

(7) The offenses as charged in the indictments were barred by the statute of limitations.

(8) The indictments are duplicitous.

(9) The indictments fail to charge any indictable offense.

By permission of the court, the defendants were allowed to take testimony in support of the reasons filed which were outside the record, and the matters were fully argued. The court, acting through Judge HUGHES, President Judge of the 27th Judicial District, specially presiding by direction of the Supreme Court, on May 29, 1939, overruled the motions to quash, filing an extended opinion in the case of *Com. v. David L. Lawrence* and others, (47 Dauphin County Reports 376), where a similar motion was pending, and a supplementary opinion in these cases (47 Dauphin County Reports 411).

Judge HUGHES' opinion (47 Dauphin 376) is too lengthy to be included in this opinion or in the reporter's statement of the case, but it constitutes a full and complete justification of the court's action in overruling the motion to quash.

The first five reasons assigned in the motion to quash have been fully considered and disposed of by Judge BALDRIGE, speaking for this Court in *Com. v. Brownmiller*, 141 Pa. Superior Ct. 107, 14 A. 2d 907, where identically the same points were raised in a motion to quash. We shall not repeat what was so well said there, but refer to it, as if a part of this opinion.

However, as respects the alleged violation of the *secrecy of the grand jury* by the special assistants to the district attorney, the two stenographers and the two dictaphone operators, we may further state that the *statutory* authority for the secrecy of the grand jury proceedings in this Commonwealth, goes back to an act of the Provincial Assembly passed in 1696, entitled "The Frame of the Government", which is found in "Charter to William Penn and Laws of the Province of Pennsylvania", published in 1879, under the direction

of John Blair Linn, Secretary of the Commonwealth. It is sometimes erroneously entitled "The Duke of Yorke's Book of Laws", probably because they are included in it. It provides (p. 248) "The Form of the Grand Inquest's Attest Shall be in these words ...... viz.:

"Thou shalt Diligently Inquire and true presentment make of all such matters and things, as shall be given thee in Charge, or come to thy knowledge, touching this present service, The Kings Counsel, [thy] fellows and thy own, thou shalt keep secret, & in all things thou shalt present the truth, the whole truth & nothing but the truth to the best of thy knowledge.

"This being given to the formen [foreman], The rest of the Inquest shall be attested thus (by three at a time), viz.: The same attestation that your foreman hath taken on his part, you will well and truly keep on your parts."

This oath is substantially the same, as respects the *jurors* keeping secret the counsel of the King, their fellows' and their own, as the "traditional and peculiar form of oath administered to the grand jurors", cited in 5 Wigmore on Evidence (2d Ed.) sec. 2360, from *Earl of Shaftesbury's Trial,* 8 Howell's State Trials, 759, 771 (1681).

Professor Wigmore, after giving excerpts from certain cases dealing with the rule and the reasons for it, says (p. 151): "These reasons are obviously fourfold in their bearing. (a) The grand jurors themselves are to be secured in freedom from the apprehension that their opinions and votes may be subsequently disclosed by compulsion. (b) The *complainants,* and the *witnesses* summoned are to be secured in freedom from the apprehension that their testimony may be subsequently disclosed by compulsion, and this in order that the State may secure willing witnesses. (c) The *guilty accused* is not to be provided with such clues as will enable him

to flee from arrest or to suborn false testimony or tamper with witnesses. (d) The *innocent accused,* who is charged by complaint before the jury, but is exonerated by their refusal to indict, is entitled to be protected from the compulsory disclosure of the fact that he had been groundlessly accused." In his discussion, Professor Wigmore shows that the third and fourth reasons, (c) and (d), disappear, as valid reasons, on the return of the indictment, either finding a true bill or 'ignoramus'. And the third and fourth reasons have no application to a purely Investigating Grand Jury, as distinguished from a regular or indicting grand jury, for in the former there is no *accused,* guilty or innocent; and as respects the action of a regular grand jury upon the innocent accused, the public character of our records discloses all persons who are accused, and a return of "Ignoramus" or "Not a true bill", is the very best vindication one can have.

A consideration of the best authorities on the subject leads to the conclusion that the rule is for the protection of the Commonwealth, the grand jurors themselves and the witnesses, and is not concerned with "protecting" the accused, whose constitutional and statutory rights are not affected by it one way or the other.

As early as 1834, the Supreme Court of this Commonwealth in discussing the *grand juror's* oath of secrecy, said in *Huidekoper v. Cotton,* 3 Watts 56, 57: "That part of the grand juror's oath, 'the Commonwealth's counsel, your fellows', and your own, you shall keep secret', has been the subject of much observation and some misconstruction. It was framed in another country, and during a state of society different from that in which we live. A powerful and disorderly baron once came with his armed followers and took the judges off the bench in York, and kept them prisoners in his castle some weeks. In such times it might have been

dangerous to a witness to have it known that he gave evidence before a grand jury against such a chieftain. ...... It is not allowed that they [grand jurors] should disclose who agreed to find the bill, and who did not agree. I shall not undertake to specify every matter which is embraced by these words. That part of the oath, as well as the whole of the proceeding, was intended to punish the guilty, without risk to those who, in performance of their duty, took a part in the proceeding; but it never was intended to punish the innocent or obstruct the course of justice."

Following this it has been uniformly held in our appellate courts that a grand juror may be called to prove what a witness testified to before the grand jury. Mr. Justice MERCUR, speaking for the Supreme Court in *Gordon v. Com.*, 92 Pa. 216, 220, said: "Substantially it was said [in *Huidekoper v. Cotton*, supra] the oath and whole proceeding before a grand jury were intended to protect the *innocent witness and juror*, but to punish the guilty party. It should not be so construed as to punish the innocent or obstruct the due course of justice. On no sound principle can it be said that a witness who has testified before a grand jury shall be permitted to claim that his evidence was a privileged communication, so that it shall not be shown, under the direction of the court, whenever it becomes material in the administration of justice. It is material when the evidence is necessary to protect public or private rights. It must be conceded that the rule shall not be carried so far as to conflict with the juror's oath. He shall not testify how he or any member of the jury voted, nor what opinion any of them expressed in relation thereto, nor to the act of either which might invalidate the finding of the jury. His action, and the action of his fellow-jurors, must be shown only by the returns which they make to the court. What a witness has testified to before them is

quite another matter. A witness may be indicted for perjury, for false swearing before a grand jury, and grand jurors are competent witnesses to prove what he swore to before them." (Italics supplied)

See also, *Com. v. Green,* 126 Pa. 531, 536, 17 A. 878; *Com. v. Fotti,* 93 Pa. Superior Ct. 365, 367-368; *Com. v. Carr,* 137 Pa. Superior Ct. 546, 558-559, 10 A. 2d 133; *Com. v. Gerstman,* 64 Pa. Superior Ct. 484, 489; *Com. v. Mead,* 12 Gray (Mass.) 167; *Com. v. Hill,* 11 Cushing (Mass.) 137.

It is to be noted that each of the special assistants to the district attorney took the customary oath of office, and the stenographers and dictaphone operators took the oath of secrecy; and nothing appeared in the evidence showing any violation of these oaths, or any conduct by any of the parties involved which was injurious to the defendants.

All of the *testimony* taken by permission of the court below, as to reasons for quashing the indictments because of matters outside the record, related to matters occurring before the 'investigating' or 'presenting' or 'special' grand jury, as distinguished from the 'regular' or 'current' or 'indicting' grand jury, which returned these indictments as 'true bills'.

The language used by this court in *Com. v. Brownmiller,* 137 Pa. Superior Ct. 261, 267, 9 A. 2d 155, speaking through Judge CUNNINGHAM, is also particularly pertinent: "We are here dealing with a district attorney's bill presented to a grand jury by leave of court. It is of little consequence where a district attorney obtains the information upon which he predicates such a request. In *Com. v. Brown,* 23 Pa. Superior Ct. 470, 495, it was obtained from the report of a committee appointed by the Board of Public Education to investigate alleged offenses by certain school directors. It has been repeatedly held that, in the absence of a 'manifest and flagrant' abuse of the powers vested in him,

the action of a district attorney in preferring a bill, with leave of court, in cases involving offenses of a public nature will not be reviewed: *Com. v. Sharpless,* 31 Pa. Superior Ct. 96, 99, *Com. v. Ramsey,* 42 Pa. Superior Ct. 25, 30, and cases there cited. Nor is it essential that the district attorney's reasons be set forth upon the record. *Com. v. Rothensies,* 64 Pa. Superior Ct. 395, 416. See also Sadler's Criminal Procedure in Pennsylvania, 2d Ed., sections 213-215, *Com. v. Green,* 126 Pa. 531, 537, 17 A. 878, and *Com. v. Norris,* 87 Pa. Superior Ct. 66. No matter how irregular the investigatory proceedings before the grand jury may have been the presentment at least furnished the district attorney with information sufficient to justify his application for leave to present a district attorney's bill."

The sixth and ninth reasons are without merit. The offenses charged dealt with grave matters of a public nature, of great importance to the civic well-being of the Commonwealth. They were peculiarly proper for the investigation of a special grand jury and for the presentment by the district attorney of a bill of indictment by leave of court. *Lloyd & Carpenter's Case,* 3 Clark 188, 190; *McNair's Petition,* 324 Pa. 48, 60, 187 A. 498; *Dauphin County Grand Jury Investigation, No. 1,* 332 Pa. 289, pp. 332, 334, 2 A. 2d 783. The indictments charged conspiracy to commit misdemeanor; the one (No. 303) a common law offense, the other (No. 304) a statutory misdemeanor. Misfeasance or misbehavior in public office for the personal aggrandizement of one's self or another, affects the public policy and economy and is indictable at common law: *South v. State of Maryland,* 18 Howard 396, 402 (U. S.) ; *Com. v. Hubbs (No. 2),* 137 Pa. Superior Ct. 244, 8 A. 2d 618; *Com. v. Brown,* 116 Pa. Superior Ct. 1, 175 A. 748; *Penna. v. Keffer,* 1 Addison 290; *Com. v. Reiter,* 78 Pa. 161; *Respublica v. Burns,* 1 Yeates 370. The suggestion that impeachment is the only remedy was effectually refuted

in *Dauphin County Grand Jury Investigation Proceedings (No. 2)*, 332 Pa. 342, 355, 2 A. 2d 802; Constitution, Art. VI, sec. 1, 2, 3. And extortion is made a misdemeanor by Act of June 9, 1911, P. L. 833, 18 PS §2932; *Com. v. Miller,* 94 Pa. Superior Ct. 499, 507, 508; *Com. v. McHale,* 97 Pa. 407, 410. See also Judge HUGHES' opinion in 47 Dauphin County Reports 411.

The seventh and eighth reasons must likewise be overruled. The indictments alleged that the offenses were committed "on or about, to wit, the first day of July A. D. 1935 and continuing until on or about the 31st day of December, 1937." "The fact that a conspiracy existed on the [31st day of December, 1937] or upon any other day within two years of the exhibiting of the bill of indictment, may be shown by the previous acts, conduct or declarations of the parties. The Statute of Limitations affects the crime, not the proof of it. . . . . . . where in conspiracy an overt act is done within two years, and said act is but one of a series of acts committed by the parties, evidently in pursuance of a common design and to carry out a common purpose, such acts would be evidence, provided they tend to show that the last act was a part of the series and the result of an unlawful combination; and such evidence may satisfy a jury of the existence of a conspiracy at the later period": *Com. v. Bartilson,* 85 Pa. 482, 489. As we said in *Com. v. Routley,* 115 Pa. Superior Ct. 125, 131, 174 A. 657—reversed in the Supreme Court, on another point—"Conspirators, by escaping prosecution for two years, do not secure immunity for their continued unlawful acts, done in furtherance of, or pursuance to, the conspiracy, after the two years have expired. A completed conspiracy must be prosecuted within two years after it *ceased;* but a conspiracy renewed by repetitions may be prosecuted, and indictment found, at any time within two years after the commission of the last offense, by charg-

ing the crime within the statutory period. While this conspiracy may have started in 1928, the evidence supported a finding that it was renewed, and the illegal gains participated in by the defendants, up to December, 1931. Hence the prosecution was not barred when the indictment charging the offense as of September, 1930, was returned a true bill at the June 1932, Sessions. See: *Com. v. Strauss*, 89 Pa. Superior Ct. 82, 91, 92; *Com. v. Girardot*, 107 Pa. Superior Ct. 274, 279, 163 A. 362; *Com. v. Rothensies*, 64 Pa. Superior Ct. 395, 405; *Com. v. Sanderson*, 40 Pa. Superior Ct. 416, 473."

The date in the indictment, within two years of the finding of the true bill, may be regarded as the date charged in the indictment and the other rejected as surplusage. See *Com. v. Dingman*, 26 Pa. Superior Ct. 615, 620. On the trial the indictments were amended so as to charge the conspiracy as "on or about the sixth day of April, 1937" (804a-806a). With the surplusage rejected, all question of the duplicity of the indictments is eliminated.

We find no error in the court's refusal to quash the indictments.

(2) REFUSAL OF DIRECTED VERDICTS OF ACQUITTAL.

We then come to the important question on the merits. Judge REESE, who presided at the trial, in his charge to the jury, properly defined a criminal conspiracy as "An agreement or combination or confederation between two or more persons, with criminal intent, to do an unlawful act or to do a lawful act by unlawful means."

The important elements of the crime are (1) a combination of two or more persons, (2) with criminal intent, or corrupt motive, (3) to do a criminal or unlawful act, or an act not in itself unlawful, by criminal or unlawful means.

In the present case, the *combination* was proved by *direct* testimony of the most convincing nature. In

fact, the *combination* was not seriously disputed by the defendants. They strenuously denied, however, any criminal intent or corrupt motive, or a combination to do an unlawful act. If the combination is formed for the purpose of committing a crime—as distinguished from an act merely illegal—,if there be a direct intention that a crime should be committed, whether it be a crime at common law or by statute, the corrupt motive or criminal intent is necessarily present, for there can be no innocent motive in a combination entered into to commit a crime. But if the combination is to do something unlawful, but not criminal, or to do something not itself unlawful by unlawful means, before the jury can convict of a criminal conspiracy they must be satisfied, from all the attending circumstances, and beyond a reasonable doubt, of the criminal intent or corrupt motive of those entering into the combination, or of at least two of them, whom they convict.

It is necessary therefore to recount at some length the circumstances in evidence which the learned court below felt warranted the jury in finding the defendants guilty and which justified it in sustaining the verdicts— with which view we are in accord. These circumstances —which the verdicts of the jury warrant us in referring to as facts—are set out in detail in Judge REESE's opinion, and amount to a demonstration of the guilt of the defendants, if the facts were as found by the jury. We may add that we have carefully read the testimony, and, in our opinion, it supports Judge REESE's review of the facts. This review takes up twenty-seven printed pages, covering a record of 1500 pages. To incorporate it into this opinion, or in the reporter's statement, would unduly extend an already long opinion. We shall, therefore, try to shorten the facts without seriously affecting their force, but in case of doubt, we refer to Judge REESE's review in full.

The defendant, Kirk, was the secretary, a director, and the owner of a fourth interest, in the Harris-Lawr-

ence Company, a corporation engaged in the general insurance and surety bond business in the City of Pittsburgh. Upon the appointment of one of his associates in that business, David L. Lawrence, as Collector of Internal Revenue in 1933, Mr. Kirk formed another insurance and surety bond agency, 'James P. Kirk Agency', of which he was the ostensible sole owner, but the manner in which the business was conducted, the books were kept, the profits were retained and not paid over to the ostensible owner, the *charging* to him as an advancement of what money he did receive, and the method of making income tax returns, would support an inference that there were others associated with him in the James P. Kirk Agency. The defendant, Skok, was a solicitor of both the Harris-Lawrence Company and the James P. Kirk Agency, which businesses were carried on in the same office and with the same staff. He was paid $2400 a year by the Harris-Lawrence Company and $500 a year by the James P. Kirk Agency, although during the period involved in these prosecutions more than half of his time was devoted to the latter's business.

In 1935, after the change of administration of the State Government at Harrisburg and the appointment of Mr. Lawrence as Secretary of the Commonwealth—he was also chairman of the Democratic State Committee—the Kirk Agency took steps to enter the field of supplying bonds to bidders who secured contracts for work in the State Highway Department. Mr. Kirk asked Warren Van Dyke, the newly appointed Secretary of Highways, for his help in getting some of this business, and the latter agreed to give it. Van Dyke spoke to some such contractors on behalf of the Kirk Agency, and at his suggestion Kirk sent Skok to see Van Dyke and to take charge of an office which the Kirk Agency opened in Harrisburg to solicit such bonds. Van Dyke introduced Skok to Mr. Temple, the chief

engineer of the State Highway Department and informed Temple that the Democratic State Committee would like them (Van Dyke and Temple) to pass the word along to contractors bidding on highway work that they place their bonds with the James P. Kirk Agency of Pittsburgh and the John J. Manley Company of Philadelphia. Temple testified that he regarded the request made by Van Dyke as an order from his superior—that a refusal to carry out the order of his superior would be insubordination, subjecting him to dismissal—, and that pursuant to such 'orders' he made efforts to 'contact the contractors' and secure the placing of bonds as requested. In carrying out these instructions, Temple suffered embarrassment; he considered the job a disagreeable one; he told Van Dyke he didn't like it, but was told in reply that they ought to go along with the suggestion of the State Committee.

Skok was informed by the Secretary of Highways and his chief engineer of the routine work of the Highway Department with respect to the awarding of contracts, and thereafter attended the lettings of such contracts held in the State Capitol Building. He had had no experience in that line of business, which was highly competitive, and knew none of the contractors engaged in that line of contracting work. But immediately on receiving information of the successful bidders, he communicated with them by letter, telephone and by personal visits, and aggressively solicited their business, and where the contractors already had made arrangements for their bonds, he demanded a part of the commissions on such bonds—that is, that the contractors instruct their insurance agents to split their commissions with the Kirk Agency—making representations or insinuations that it would be to their interest to do so because of the contacts or connections the Kirk Agency had with the administration, or party in power, or similar influences and in many instances secured a split in the

commissions although they had rendered no service with respect to the securing and placing of the bonds.

In this work of solicitation, of which Kirk had full knowledge, Skok had the aid and assistance of Chief Engineer Temple, acting under the instructions of Secretary of Highways Van Dyke.

Temple directed his assistant chief engineer to announce at the time of the opening of the bids that the low bidders were to call at the office of the chief engineer. In cases where the low bidders failed to call at the office of the chief engineer, letters, written at his direction, were sent to the contractors requesting that they call to see Mr. Temple at his office in the State Capitol Building. In these letters no mention was made of the purpose for which they were asked to call upon the chief engineer. When the contractors who received such letters met with the chief engineer, they were informed by him that he had been requested by Mr. Van Dyke, the Secretary of Highways, to pass along the word to contractors that the General (State) Committee would appreciate it if they would favor the Kirk Agency or the Manley Agency with their bonding business.

The chief engineer pursued this policy of requesting contractors to favor the Kirk Agency of Pittsburgh and the Manley Company of Philadelphia with their bond business because of the "request" made of him by Secretary of Highways Van Dyke. At the time of making these requests he was under the impression that Matthew McCloskey was interested in the Manley Insurance Company, and that the Kirk Agency was representing the Harris-Lawrence Company. He believed that David L. Lawrence, Chairman of the Democratic State Committee, had an interest in the Harris-Lawrence Company and was associated with Kirk in the insurance business.

The letters that were written by Chief Engineer Temple to the contractors requesting the latter to call

to see him were usually prompted by the receipt of letters from the defendant Skok.

Both Skok and Manley, the latter the owner of the John J. Manley Agency, knew of the instructions that had been given to Chief Engineer Temple by Secretary of Highways Van Dyke. Together they informed Temple that there had been worked out an arrangement whereby the Manley Agency was to secure the highway construction bond business in the eastern part of Pennsylvania and the Kirk Agency was to secure the bond business in the western part of Pennsylvania.

In carrying out the instructions given him by Van Dyke, as aforesaid, the chief engineer made requests of many contractors that the Kirk Agency and the Manley Agency be favored with highway construction bond business.

The defendant Kirk was fully aware that Skok had arranged with Temple to "contact" contractors and that he and the Secretary of Highways were interesting themselves in behalf of the Kirk Agency, and that many of the bonds obtained or commissions split were obtained from contractors located a great distance from his agency, who did not have a personal acquaintanceship with him or Skok.

The testimony showed that at the time these requests were made of the successful contractors by the chief engineer, they were familiar with the standard form of contract under which their work was to be performed, and they knew that paragraph 2 in those contracts made the chief engineer the final authority on the inspection, supervision and performance of the work, subject only to the right of appeal in paragraph 9 to the Secretary of Highways and the Attorney General; and they also knew that the awarding of contracts and the passing upon the financial responsibility of the successful contractor was under the control of the Secretary of Highways; and in at least two instances, contracts on which Donatelli & Donatelli and

Conte-Eastwood Company respectively, were the successful bidders, whose bonds had been arranged for them by Emile Rossi, a Pittsburgh insurance broker, the awarding of the contracts was held up for several months, pending an alleged investigation into their financial statements, which was quickly resolved and the contracts executed, when Rossi, who had been importuned by Skok for a split of the commissions, finally agreed to it, although neither Skok nor the Kirk Agency had performed any service. In another instance, Fasenmyer, an Erie contractor, was awarded a highway construction contract and placed his bond with his regular agent, I. D. McQuistion. Shortly thereafter Fasenmyer was called on the telephone by Skok who solicited his bond. When told that the bond had been placed with McQuistion, Skok nevertheless insisted on having the bond, and finally Fasenmyer said to Skok, "What is this, a political holdup?" To which Skok replied, "Well, if you want to call it that." Fasenmyer also received a letter from the Kirk Agency over Skok's signature stating that their securing of Fasenmyer's bond "would be greatly appreciated by the *Highway Department*." Thereafter on April 20, 1937, as the result of further solicitation on the part of Skok, Fasenmyer and his partner decided that it would be best that the Kirk Agency receive a split in their bond commissions, and in compliance with Fasenmyer's instruction on September 4, 1937, McQuistion paid to the Kirk Agency one-half of his commissions. No services of any kind were rendered by the Kirk Agency in connection with any of the Fasenmyer bonds. (Italics supplied)

Three original letters—Exhibits 1, 2 & 3,—written by Skok, on behalf of the Kirk Agency, to Temple, photostatic copies of which were produced at the argument—and which escaped the destruction or 'discarding' by Skok of all *copies* of his letters to Temple, although he preserved copies of all his other letters—are convinc-

ing of the concert of action and unity of purpose of the defendants and Van Dyke and Temple.

Letter No. 1, dated October 5, 1936 contains an express request to Temple from the Kirk Agency to see that it was favored with the bonds of five designated contractors. Among them was the Conte-Eastwood Company, already referred to, as to which Skok wrote: "We are particularly interested in the last one mentioned as it is the best of the bunch. I talked with Mr. Conte and he is favorable that the bond be placed with us, but I know that a word from you along this line would put the deal across."

Again, in Letter No. 2, he refers to five more contracts and says that he has already 'contacted' four of them, among them Donatelli & Donatelli, "but a word from you relative to these bonds will put the deal across." Mr. Temple's notation showed that he gave the word.

Each of these letters contained a note at the bottom, "c. c. to Miss A. E. Priddy", which meant that a *carbon copy* of the letter had been sent to Miss A. E. Priddy, secretary for Mr. Lawrence, who was Secretary of the Commonwealth and Chairman of the Democratic State Committee; its admitted purpose being to call the attention of the chief engineer to the fact that the letters had been brought to Mr. Lawrence's notice and were likely to have his personal attention and examination into the results obtained.

The combination charged in these indictments was not that the defendants had obtained the influence and assistance of the State Committee in securing these bond contracts, which, apart from the State officials who might be connected with it, was at liberty to assist, in a legal way, their political friends in obtaining business growing out of government contracts; but the charge was that the defendants had combined with the Secretary of Highways and the Chief Engineer of the Highway Department whose official duties were re-

spectively (1) to award contracts for work on the state highways, pass upon the financial responsibility of the successful bidders and execute the contracts and (2) to inspect and supervise the performance of the work under said contracts, to bring their influence to bear upon the successful bidders to secure the bonds for the faithful performance of these contracts from the insurance agency represented by these defendants, or a division of the commissions paid to other insurance agents who had secured the contractors' bonds. When one considers how difficult the path of a contractor can be made, even when faithfully performing his contract, by a hostile inspector or one bent upon *finding* imperfections and derelictions in the work, and, on the other hand, how a contract can be skimped when supervised by a venal inspector, one does not need evidence of *threats* to persuade a contractor that his interest will be best served by getting his bond from the agency favored by the officials who are to award the contract and inspect and supervise the performance of the work under the contract. And it was not necessary for the Commonwealth to prove any actual venality in the awarding of contracts or in the inspection and supervision of the work.

As Judge REESE aptly put it: "The use of the Chief Engineer's office in influencing the placing of bonds with certain favored agencies for the private gain of the individuals owning or interested in such agencies was a clear violation of the duties of a public official. A public office is understood by all to be a public trust. To honestly administer such trust the official in whose charge it is placed must give his undivided loyalty to the people of the Commonwealth. To permit the power and influence of his office to be used for private gain and to place himself under obligation to contractors was in effect to attempt to serve two masters, and had a necessary tendency to destroy the sanctity of the obligation assumed by Temple when he accepted the

office of Chief Engineer. The defendants, at whose instance the power and influence of the office was so misused and abused and who exploited such misconduct, were by the jury's verdicts properly held responsible for combining and confederating to accomplish an unlawful act contrary to public morality."

The practical effect of such influence was seen in the results obtained, as set forth in Judge REESE's opinion: "Skok commenced his activities in the highway construction bond field in the summer of 1936. Prior to that time he had no experience along that line nor was he acquainted with highway contractors, [and] the new field in which he embarked was highly competitive; and yet, despite his lack of experience and the keenest of competition, during the balance of the half year remaining in 1936 Skok succeeded in securing bonds or participation in bond commissions in 73 cases. During the entire year of 1936 there was filed in the Highway Department a total of 431 bonds. The following year, 1937, Skok succeeded in securing bond business in 113 instances out of a total of 410; and in the year 1938 he succeeded in securing bonds or participation in bond commissions in 72 out of a total of 305 bonds filed in connection with the highway construction contracts. In the year 1938 his efforts were not as successful as in the last half of 1936 and in the year 1937, and this is explained by the discontinuance of the office that had been maintained by the Kirk Agency in the Penn-Harris Hotel in Harrisburg. The discontinuance of this office occurred in April, 1938, the same month during which proceedings were commenced in Dauphin County for holding a Grand Jury investigation. Skok claimed that his success in securing bond business was due to his solicitations. It seems improbable that in a field so highly competitive he could succeed in securing so much business from contractors whom he did not know and most of whom were located at great distances from the City of Pittsburgh. Contractors were led to believe

that he had 'contacts' within the Highway Department, and this belief would necessarily tend to cause contractors and their insurance agents to feel that unless the Kirk Agency was favored with their business or permitted to share in their commissions those 'contacts' might create difficulties for the contractors in the performance of their work."

The verdict against the defendants in No. 304 is not affected by the fact that the jury acquitted Temple on that charge. Verdicts in criminal cases do not have to be consistent: *Com. v. Kline,* 107 Pa. Superior Ct. 594, 602, 603, 164 A. 124 (PARKER, J.) ; *Dunn v. United States,* 284 U. S. 390, 393 (HOLMES, J.) ; but the jury may have concluded from Temple's testimony that whatever part he had in the combination was done pursuant to the orders of his superior, the Secretary of Highways, and did not involve any personal criminal intent on his part.

The assignments of error are overruled. The judgment in each appeal is affirmed, and it is ordered that the appellants severally appear in the court below at such time as they may be there called and that they be by that court committed until they have complied with their respective sentences.