Commonwealth, Appellant, *v.* Fabrizio.

46

Argued June 13, 1961. Before ERVIN, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (RHODES, P. J., and WRIGHT, J., absent).

Before WOODRING, J.

*Solomon Lubin,* Assistant District Attorney, with him *Vincent M. Quinn,* First Assistant District Attorney, *Stephen A. Teller,* District Attorney, Luzerne County, and *Andrew Herster,* District Attorney, Northampton County, for appellant.

*Thomas F. Burke,* with him *Arthur A. Maguire,* and *B. Todd Maguire,* for appellees.

OPINION BY WATKINS, J., December 15, 1961:

These appeals are by the Commonwealth of Pennsylvania from the order of the Court of Quarter Sessions of Northampton County granting the defendants appellees motions in arrest of judgment after their conviction by a jury of the charge of conspiracy in violation of §302 of the Act of June 24, 1939, P. L. 872, 18 PS 4302.

On January 22, 1959, twelve men, ten of whom were employees of the Knox Coal Company, and two, employees of the Pennsylvania Coal Company, lost their lives when the Susquehanna River broke through the roof and inundated the "River Slope" mine of the Knox

Coal Company, located in Luzerne County, Pennsylvania, and leased by the Knox Coal Company from the Pennsylvania Coal Company.

As a result of the investigation of this tragedy one manslaughter indictment was brought for the death of each victim and each indictment named the following seven men as defendants: Grove and Receski, employees of Knox Coal Company; Renner and Fries, officers of the Pennsylvania Coal Company; Dougherty and Fabrizio, officers of Knox Coal Company; and Lippi, an official of the United Mine Workers of America.

Fabrizio, Dougherty and Lippi were also indicted for conspiracy and Renner and Fries for violation of the Anthracite Mining Law.

The Court of Quarter Sessions of Luzerne County dismissed motions of the defendants to quash the conspiracy indictment on the ground that the crime was not charged within the period of the statute of limitations and on the same day denied motions of the defendants for a change of venue.

Subsequently, by order of the Supreme Court of Pennsylvania, dated February 11, 1960, venue for the trial and disposition of the conspiracy indictment was removed from Luzerne County and assigned to the Court of Quarter Sessions of Northampton County. Appellees' motions to quash on the statute of limitations ground were renewed in that court and again overruled.

Grove and Receski were tried on the manslaughter indictments in Luzerne County and found not guilty. The manslaughter indictment as to the others, the conspiracy indictment and the Anthracite Mine Law violations were consolidated for trial in Northampton County. At the conclusion of the Commonwealth's case demurrers for Renner and Fries were sustained. This was also true in the Mine Law violations and

these defendants were discharged. The verdicts as to manslaughter were, Louis Fabrizio, guilty; Robert L. Dougherty, not guilty, costs on the county; August J. Lippi, guilty. On the conspiracy charge: Louis Fabrizio, guilty; Robert L. Dougherty, guilty; August J. Lippi, guilty.

Motions in arrest of judgment were granted by the court below on both convictions and the Commonwealth is appealing only from the order of the court en banc granting the motions in arrest of judgment as to the conspiracy indictment.

We also have before us motions to quash the Commonwealth's appeal on the ground that the district attorney of Luzerne County was not authorized to file these appeals after the change in venue.

The facts are succinctly stated by the court below as follows:

"On January 22, 1959, in Jenkins Township, Luzerne County, the Susquehanna River at flood stage broke through the roof of the 'River Slope' of the mines of Knox Coal Company. The breakthrough resulted in a flooding of the mines, and twelve persons were entombed. One manslaughter indictment was brought for the death of each victim and each indictment named the following seven men as defendants: Fabrizio, Dougherty, Lippi, Renner, Fries, Groves, and Receski.

"The Knox Coal Company, a Pennsylvania corporation, engaged in the mining of anthracite coal, entered into a lease on December 22, 1943, with the Pennsylvania Coal Company, another Pennsylvania corporation and the owner of certain coal lands, whereby Knox was authorized to remove coal from designated land of Pennsylvania Coal. Knox continued to operate until the date of the fatal breakthrough, January 22, 1959. In 1943 Robert L. Dougherty was employed by Knox as general manager. He continued in that employment

until August 13, 1958, when he resigned and terminated his employment.

"In support of the conspiracy indictment the Commonwealth endeavored to remove the protection of the corporate veil of Knox Coal Company and prove that Knox was not a corporation but rather a business association for the benefit of Fabrizio, Dougherty and Lippi. Knox failed to keep proper business records, copy of its bylaws, records of the proceedings of the shareholders and directors, and a share register.

"The stock certificate book (Commonwealth's Exhibit No. 34) showed that on December 18, 1950, the apparent ownership of 990 shares of the 1,000 shares authorized in the corporate charter was as follows: 495 shares, Josephine Sciandra; 495, Louis Fabrizio. On the same day Josephine Sciandra, Louis Fabrizio and August J. Lippi, together with Robert L. Dougherty, President and General Manager of Knox, entered into a trust agreement (Commonwealth's Exhibit No. 12), signed by each of the parties, in which it was stated that Fabrizio owned 330 shares; Sciandra, 280 shares, and Lippi, 280 shares. Each of the parties was to insure his life in favor of each of the other parties. This was done and policies of insurance were issued by Sun Life Assurance Company of Canada whereby each of the parties to the trust agreement insured his life in favor of each of the other parties in the sum of $25,000, or a total of $300,000.00. Premiums on these policies were paid, not by the parties, but by Knox.

"Books of Knox (Commonwealth's Exhibits 35 and 36) showed that dividends were paid by Knox on October 16, 1956, as follows: Josephine Sciandra, $2,500.00; Louis Fabrizio, $2,500.00; 'Cash', $2,500.00. On the same day a payment was made to Robert L. Dougherty in the sum of $2,500.00, which said sum was charged to 'salaries'. . . . The dividend checks payable to 'Cash' were drawn on the First National Bank of Exeter, of

which defendant August J. Lippi, was President. The cashier of the bank testified that he cashed these checks, unendorsed, but that he could not remember for whom he cashed them.

"Turning our attention to the facts concerning the River Slope area of the Knox Coal mines and the operations therein, the testimony discloses, and the Anthracite Mine Law, 1891, P. L. 176, 52 PS 261, etc., provides, that an accurate map of the workings of a coal mine shall be prepared and that a copy shall be deposited with the Inspector of Mines for the district in which the mine is situated. The law provides further that at least once in every six months the plan of extensions made in the coal mine be placed on the inspector's map. · The contract of leasehold between Pennsylvania Company and Knox provided that the preparation and maintenance of the maps shall be done by the Pennsylvania Company at the expense of Knox. The maps in the instant case include, inter alia, boreholes which indicate the thickness of rock cover above the mine at various points and a red boundary line which is known as a stop line and which indicates the maximum limits within which mining is permitted. The stop line as employed indicated a minimum rock cover thickness of 35 feet.

"The method of operation between Knox and Pennsylvania Company was for Knox to prepare applications for permits, known as 'forecasts'. The applications were then submitted for approval to the mining engineer of Pennsylvania Company. The purpose of the 'forecasts' was to obtain lessor's permission to extend the mining operation into additional areas.

"In the instant operation the River Slope shaft was sunk in 1954 and mining was done to the east of the shaft, away from the Susquehanna River and away from the stop line. The September 10, 1956, forecast, No. 503, sought to extend the mining area to both the east and west sides of the shaft and under the bed of

the river. Three chambers were contemplated two were to be 148 feet long, and one was to be 124 feet. These chambers were not driven as authorized in the forecast but were driven 'off course' and into the area under the river bed and beyond the stop line. One of the chambers was driven in excess of the forecasted length of 124 feet and was actually driven 264 feet to a point within 75 feet of a borehole which indicated a rock cover of 19 inches, whereas the accepted minimum rock cover was 35 feet. Later, crosscuts were driven, without permits, to connect the 'off course' chambers and provide them with ventilation.

"Milner, the transit man for Pennsylvania Company, made the semi-annual surveys of March and September, 1958. The purpose of these surveys is to determine and indicate where mining has been done since the last previous survey. Milner testified that when making the survey in the mine he was unable to determine the exact location of the chambers with respect to the mine map and the forecast. He said that when the data was plotted, the end of October or early November, 1958, he realized that two of the chambers were off course and that they extended under the bed of the river and beyond the stop line. Milner testified that he immediately reported these facts to Fries, district engineer for Pennsylvania Company. There is a complete lack of testimony, however, that this fact was brought to the attention of any Knox officers or employees.

"Another chamber, beyond the two 'off course' chambers, was driven, also without permission, within the area of an anti-cline, above which the rock cover was only 19 inches thick. In this chamber was a piece of machinery, a shaker chute, used for transporting the loose coal. This chamber was known, therefore as the Shaker Chute Place.

"On or about January 9, 1959, Shirey, State Mine Inspector of the Commonwealth, commenced an in-

vestigation and inspection of the River Slope of Knox with reference to a fatal accident. Shirey continued his investigation on Monday, January 12, 1959, and that evening realized that the mine roof in the Shaker Chute Place had a rock cover of only 19 inches. The next morning, January 13, 1959, at 8:15 a.m., Shirey went to the superintendent's office, Mr. Groves, and ordered all mining stopped. There is no suggestion, however, that this information was communicated to or known by any of the defendants in the case at bar. Despite the stop order which was communicated to Groves, Knox' superintendent, Receski, Knox mining engineer and assistant mine foreman for the River Slope, at 2:00 p.m. on that same day, January 13, 1959, gave miner Lucas instructions to shoot through the Shaker Chute face. Lucas and his co-employees did blast a hole 4 feet in diameter, through the face of the Shaker Chute Place at 4:00 o'clock that afternoon and removed 13 carloads of coal. It was at this point that the river broke through in the early morning of January 22."

We will first dispose of the motions to quash. The Supreme Court of Pennsylvania directed a change in venue from Luzerne County to Northampton County where the cases were tried. It is true that although the district attorney is a constitutional officer, Constitution of Pennsylvania, Article XIV, §1, he has only countywide jurisdiction as prescribed by The County Code. Act of 1955, P. L. 323, 16 PS 1402. This act provides that he shall conduct all criminal and other prosecutions "which arise in the county for which he is elected".

However, when an order for a change of venue is made, ". . . the trial of said case shall be conducted in the court to which it shall be removed in all respects as if the indictment had been found in the county to which the venue is changed; . . .". 1875, March 18, P. L. 30, §3, 19 PS 553. Then the district attorney of

the county to which it was sent became the responsible head of the prosecution. *Commonwealth v. Reilly*, 326 Pa. 56, 191 A. 14 (1937).

In these cases, the district attorney of Northampton County invited and authorized the district attorney of Luzerne County and his assistants to prosecute the cases, with him, for and on behalf of the Commonwealth, and specially moved the Northampton Court for their admission for that purpose. The record shows the entry of the appearances of the district attorney of Luzerne County and certain of his assistants and their active participation in the conduct of the trial, even though the district attorney's office of Northampton County was always represented at the trial by someone from that office and although the trial was always officially in his charge. Even though the district attorney of Northampton County is the responsible head of the prosecution he may associate with him the district attorney of the county where the offense was committed or any of his assistants. *Commonwealth v. Deutsch*, 72 Pa. Superior Ct. 298 (1919).

It logically follows that if the district attorney of Northampton County may associate the district attorney of Luzerne County with him for the purpose of the prosecution, on behalf of the Commonwealth, that such association carries with it the authority to conduct the case to its ultimate conclusion and so includes any necessary appeals. This is especially true in view of the fact that the action was authorized, directed, ratified and consented to by the responsible head of the prosecution, the district attorney of Northampton County, as indicated by the entry of his appearance and his joinder in the appeals. The motions are denied.

The court below, in granting the defendants' motions in arrest of judgment, held that the two-year statute of limitations barred the prosecution for conspiracy when the conspiracy is alleged, in the bill of

indictment, to have commenced on a date beyond the statutory period and continued up to the date of the indictment. Motions to quash, for this reason, had been argued before the Court of Luzerne County and before the trial judge in this case, before the jury was sworn, and in both instances, the motions were denied. The court, by its order in these cases, has determined that it was in error in refusing to grant the motion to quash the bill of indictment.

The court below relies on the rule of law set forth in *Commonwealth v. Bartilson*, 85 Pa. 482 (1878). The pertinent facts in this case are as follows: Bartilson and others were indicted May 27, 1877, for conspiracy to cheat and defraud. The indictment contains two counts but for our purposes we are only interested in the first count, which charged that defendants on December 20, 1874, conspired to cheat and then proceeded to state a series of overt acts done in pursuance of the conspiracy. Each of these averments of overt acts is linked to that which preceded it and to the original charge of conspiracy to cheat by the allegation that it was in pursuance of said conspiracy. Several of the overt acts were within the statutory period.

The trial judge quashed this bill of indictment and the Supreme Court affirmed. The *Bartilson* opinion, written by Mr. Justice PAXSON, said in part, at page 486, "The conspiracy is averred to have been formed on the 20th of December, 1874. This was more than two years prior to the finding of the bill, and upon this ground the court below quashed the count. It was strongly urged, however, that inasmuch as it was averred in said count that the defendants had in, 'pursuance and renewal of said conspiracy', committed divers overt acts specifically described in said count, the date of one of which at least was within the statutory period, there was a continuance and renewal of the conspiracy from time to time, and the statute was thereby tolled. This is plausible but unsound. . . . The

difficulty in regard to this count arises merely from a mistake in pleading. The date of the conspiracy should have been laid within the statutory period. The Commonwealth must allege and prove a conspiracy within two years. If this cannot be done the Commonwealth has no case. The pleader evidently felt the strain of this part of his case when he introduced the averment that the overt acts were in 'renewal' of the original conspiracy. It was practically laying an offense with a continuando; it was an attempt to prove the existence of a crime within the statutory period, by showing its commission outside of such period, and that it had been continued down to a time within it. . . . It (the case of Gise v. Commonwealth, 81 Pa. 428) was not intended to assert the absurd proposition that a man might not repeat an offense from day to day, as in the case of maintaining a nuisance, and other familiar instances which might be referred to. This may be done daily for any indefinite period. But a man could not be convicted of maintaining a nuisance charged to have been committed ten years prior to the finding of the bill of indictment by proving that he had continued the nuisance, day by day, to a time within the statutory period. . . . It may be repeated from day to day, but the statute runs from the close of each day, and the indictment must charge the offense to have been committed within the statutory period."

There is no doubt that our indictment is on "all fours" with the Bartilson indictment. The conspiracy charged here is sixteen years before the finding of the indictment and the language endeavors to bring the relationship within the statutory period by a continuando. In fact, the instant case is much weaker in that no date was indicated except by reference to the date of the indictment, while specific dates appear in the *Bartilson* case. In the *Bartilson* case the indictment sets forth certain overt acts being "in pursuance and

renewal of said conspiracy". In our case the conspiracy is alleged as of December 22, 1943, and that it continued to the date of indictment. There isn't any allegation of overt acts at all or anything done in pursuance and renewal of said conspiracy at any time, including the date of the indictment. So, it is quite clear, that our indictment is much weaker than the Bartilson indictment and if the rule of the *Bartilson* case is still the law, the court below properly arrested judgment.

The Commonwealth has presented a strong argument in an attempt to distinguish, explain away and avoid the application of the rule in the *Bartilson* case and urges that its position is sustained by *Commonwealth v. Kirk,* 141 Pa. Superior Ct. 123, 14 A. 2d 914 (1940), affirmed in 340 Pa. 346, 17 A. 2d 195 (1941); and by *Commonwealth v. Dunie,* 172 Pa. Superior Ct. 444, 94 A. 2d 166 (1953).

In those cases where there are continuous and repetitious overt acts or trespasses as a part of a continuing conspiracy, it has been held that the statute of limitations does not begin to run until after the commission of the last act of the conspiracy. However, where no allegation of any acts are made except the bald continuando then a conspiracy is actionable only when it produces an overt act in furtherance of the conspiracy and no authority need be cited for the proposition that in such a situation no continuing trespass is shown. *Helmig v. Rockwell Mfg. Co.,* 389 Pa. 21, 35, 131 A. 2d 622 (1957). The indictment must charge the offense to have been committed on a day certain within the statutory period. *Commonwealth v. Dingman,* 26 Pa. Superior Ct. 615.

The cases seem to make a distinction between conspiracies in which the commission of an overt act is a constituent element of the crime and conspiracies in which the concert, combination or association constitutes the offense in itself. 62 A.L.R. 2d 1372.

In *Commonwealth v. Kirk,* supra, the court held that a conspiracy renewed by repetitions may be prosecuted and the indictment found at any time within two years after the commission of the last offense by charging the crime within the statutory period. However, the court said, at page 137, "The date in the indictment, within two years of the finding of the true bill, may be regarded as the date charged in the indictment and the other rejected as surplusage. See Commonwealth v. Dingman, 26 Pa. Superior Ct. 615, 620. On the trial the indictments were amended so as to charge the conspiracy as 'on or about the sixth day of April, 1937' (804a-806a). With the surplusage rejected, all question of the duplicity of the indictments is eliminated." It appears, therefore, that the defects in this indictment were eliminated by amendment at the trial and the conspiracy was laid within the statutory period.

In *Commonwealth v. Dunie,* supra, at page 447, the Court said, "Because the conspiracy was formed in 1945, appellant argues that the prosecution begun in 1950 was barred by the Statute of Limitations. The conspiracy indictment was drawn under The Penal Code of June 24, 1939, P. L. 872, 18 P.S. §4302, which condemns a conspiracy 'to cheat and defraud any person of his moneys, goods, chattels, or other property, . . .' and charged the commission of the offense within the two-year statutory period. The proof is that Hauck and appellant, from 1945 to September 1950, continuously engaged in criminal acts pursuant to their agreement. It was a combining conspiracy which was not terminated until it was discovered in September 1950. The agreement to cheat and defraud another person is not the end of the offense and the statute does not begin to run until the conspiracy has ceased. Com. v. Donnelly, 40 Pa. Superior Ct. 116. A conspiracy renewed by repetitions may be prosecuted, and indict-

ment found, at any time within two years after the commission of the last offense, by charging the crime within the statutory period. Com. v. Kirk, 141 Pa. Superior Ct. 123, 14 A. 2d 914, affirmed 340 Pa. 346, 17 A. 2d 195. Appellant was properly convicted for conspiracy."

The date of the commencement of the alleged conspiracy in our case is fixed in the bill of indictment beyond the statutory period and the evidence presented in support of it, as shown by the statement of facts, discloses a trust agreement, dated December 18, 1950, tying the parties together, dividends paid in pursuance of this agreement on October 16, 1956, and on January 16, 1957. All dates, therefore, are outside the statutory period. These incidents, of course, could have been used for proof of a conspiracy laid within the statutory period. The statute of limitations affects the crime and not the proof of it.

Conspiracy, because of its peculiarly broad application, has come to be used as a catch-all crime, especially in those cases where the prosecution has great difficulty in proving a specific crime. The real crime in this case was the manslaughter charge, based on the Knox Coal Company disaster. But the court below arrested judgment, after conviction on that charge, because there was insufficient evidence to sustain the verdicts. The Commonwealth does not complain of this action by the court below. Because of the nature of the crime of conspiracy, it is, therefore, necessary that indictments charging it should be strictly construed as to the dates and incidents of the conspiracy, especially as to the application of the statute of limitations.

Order affirmed.

MONTGOMERY and FLOOD, JJ., concur in the result.