Commonwealth *v*. DiEmidio et al., Appellants.

Argued April 9, 1962.   Before Rhodes, P. J., Ervin, Wright, Woodside, Watkins, Montgomery, and Flood, JJ.

*Vincent M. Casey* and *Paul A. Gleason,* with them *Arnold M. Smorto, Richard S. Graff,* and *Andrew J. Gleason,* and *Margiotti & Casey,* and *Smorto & Creany,* and *Gleason & Krumenacker,* for appellants.

*Harry A. Heilman, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY WOODSIDE, J., June 15, 1962:

This is an appeal from the judgments of sentence imposed upon two defendants after motions for arrest of judgments were refused by the court below.

Andrew A. DiEmidio and Joseph E. Yobbagy were each indicted for statutory extortion, common law extortion and conspiracy. A jury found DiEmidio guilty of common law extortion and conspiracy and he was sentenced to a fine and five months in jail. It found Yobbagy guilty of conspiracy only, and he was sentenced to a fine and three months in jail. Both defendants contend that they should be discharged because of an omission in the indictments and, in addition, Yobbagy contends that there was insufficient evidence to sustain his conviction.

Both defendants were employes of the Department of Health of the Commonwealth of Pennsylvania, and

were assigned to the Mine Drainage Unit of the Sanitary Water Board. DiEmidio, who was a Mine Drainage Engineer I, had been with the department 12 years, and Yobbagy, who was a Water Pollution Investigator, had been with the department since 1958. One of the duties of the defendants was to investigate and examine strip mining operations to determine whether they were being conducted according to law.

On March 15, 1960, the defendants inspected the strip mining operation of the P. & L. Coal Company, a partnership of Peary Farester and Lucille E. Farester, his wife. It appeared to DiEmidio that the Faresters were stripping beyond the area for which they had secured a permit from the Sanitary Water Board. After DiEmidio and Yobbagy discussed the possible violation with Peary Farester at the scene of the mining operation, they went to the company's office to examine the permit and the blueprints and maps of the area. Because it was late in the afternoon when they arrived at the office, they agreed to meet there the following morning to discuss the matter further.

The next morning the defendants and the Faresters met at breakfast and then went to the company's office. Mr. Farester walked up the steps to the office with DiEmidio, and Mrs. Farester and Yobbagy followed them. Mrs. Farester said to Yobbagy that she was worried because they would lose everything if they were forced to close their operation for two or three months. Yobbagy said he did not think she needed to worry, and then suggested that she walk down the hall with him.

Mrs. Farester testified as follows as to what then happened: "The best of my recollection was that this thing could be taken care of. And at first, I had a hard time getting it through my head exactly what he meant, and finally I said to him, 'Do you mean that this would be a payoff.' And I don't recall his exact words, but . . . As near as I can recall, he said, yes, that Mr. Di-

Emidio could be talked to, that he was the eyes and the ears of the Sanitary Water Board, and only what he saw was reported to the Ebensburg office." Mrs. Farester then called her husband aside and told him of this conversation.

The four of them, along with a stenographer and the company's manager, went into the company's office. For a time they examined the permit, a map and other documents together. Then Mr. Farester, the company's business manager, and DiEmidio went into a private office. There DiEmidio told Farester that if he made this "pay-off" they would see to it that he was not bothered,—that they would take care of it, and the Faresters could hurry up and strip that coal out and back-fill and everything would be all right. Farester said that the company was not able to stand too much, but maybe he could scrape up a couple hundred dollars apiece. A check was then made out for $400 and taken to the bank and cashed by a stenographer who gave the cash to DiEmidio. He put it into his pocket, joined Yobbagy in the other room and the two of them left the company's office together.

The Faresters continued to operate without interference, but several weeks later DiEmidio returned alone and collected another $300. DiEmidio subsequently signed a confession admitting the collection of $700. There is no evidence that Yobbagy received any of the money.[1]

A common law conspiracy is an agreement between two or more persons to do an unlawful act or a lawful act by the use of unlawful means. 7 P.L.E. Conspiracy §21; *Commonwealth v. Benz,* 318 Pa. 465, 466, 467, 178 A. 390 (1935); *Commonwealth v. Horvath,* 187 Pa. Su-

---

[1] DiEmidio did not testify at the trial, but his statement acknowledging receipt of the $700, was admitted into evidence. It contains a statement that he gave none of the money to Yobbagy.

perior Ct. 206, 211, 144 A. 2d 489 (1958). Was there sufficient evidence presented to the jury in this case from which it could infer that there was an agreement between the defendants to commit an unlawful act?

Where the acts of the parties indicate that they were acting in concert to a common end, the jury may infer that the concerted action was the result of an unlawful agreement. *Commonwealth v. Rosen*, 141 Pa. Superior Ct. 272, 277, 14 A. 2d 833 (1940). "An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." *Commonwealth v. Strantz*, 328 Pa. 33, 43, 195 A. 75 (1937). The agreement need not be formal by express words, but may be inferred from concerted action. *Commonwealth v. Horvath*, 187 Pa. Superior Ct. 206, 211, 144 A. 2d 489 (1958).

There was ample evidence to support the jury's finding that there was an agreement between the defendants to do an unlawful act. Although they had been working together for only a week prior to the inspection of the P. & L. Coal Company's mining operation, they were together when they discovered what was believed to be a violation. It was Yobbagy who first approached one of the partners and suggested that a "payoff" to his fellow employe would prevent information concerning the possible violation from reaching higher authorities. Complying with his suggestion, one of the partners offered "a couple hundred dollars apiece" for the two defendants, and DiEmidio accepted this money with the promise that they would not report the mining operation in the area for which there apparently was no permit.

In the light of the suggestion by Yobbagy that his partner would accept money to withhold information from his superiors unfavorable to the Faresters, and

the acceptance of money for that purpose by DiEmidio, the jury could infer that the two defendants had agreed to extort money from the Faresters. It is immaterial whether Yobbagy ever received any of the money which DiEmidio received from the Faresters. The evidence against Yobbagy was sufficient to sustain his conviction on the charge of conspiracy.

Both of the defendants contend that they are entitled to be discharged because their names were not repeated in each count of the indictment. The indictment charges that "Andrew A. DiEmidio and Joseph E. Yobbagy" committed statutory extortion. A second count charging common law extortion and a third count charging conspiracy omitted the defendants' names. These counts each contain a blank which appears as follows: "And the Inquest aforesaid, inquiring as aforesaid, upon their oaths and affirmations, respectfully as aforesaid, Do Further Present, that the said ————————————— —afterwards, to-wit:" etc.

It is, of course, important that the indictment indicate who is charged with what. Here, the indictment contains the correct names of the two defendants; no motion was made to quash the indictment for not repeating the names in the second and third counts; the defendants entered their pleas on the indictment and not only on the first count; it is clear from the record of the trial that both defendants knew the offenses for which they were being tried; there was no objection to the charge submitting to the jury the question of the defendants' guilt on the second and third counts. Upon reading the entire indictment no person would fail to understand that "the said", whose names did not appear in the second and third counts, were the parties whose names appeared in the indictment in the first count. The defendants should not be discharged on a hypertechnical objection not raised until after they en-

tered their pleas, stood trial and were convicted. For the liberal right in this Commonwealth to amend indictments during trial and even after verdict see §13 of the Act of March 31, 1860, P. L. 427, 19 P.S. §433; *Commonwealth v. Tassone,* 246 Pa. 543, 92 A. 713 (1914).

In passing upon criminal pleadings, the courts look more to substantial justice than to technicalities, and artificial niceties. *Phillips v. Commonwealth,* 44 Pa. 197 (1863) ; *Commonwealth v. Speiser,* 79 Pa. Superior Ct. 469 (1922) ; *Commonwealth v. Keenan and Clark,* 67 Pa. 203 (1871). The names of the defendants having appeared in the first count, it is not fatal that they were not repeated in the following counts. See *State v. Hurley,* 251 S.W. 2d 617 (Mo.) (1952). One count may refer to a matter in another count and though the count referred to be rejected by the jury, that fact will not vitiate the residue. *Commonwealth v. Ault,* 10 Pa. Superior Ct. 651 (1899).

Judgments of sentence are affirmed, and it is ordered that appellants appear in the court below at such time as they may be there called, and that they be by that court committed until they have complied with their sentences or any parts thereof which had not been performed at the time the order of supersedeas was entered.

---

DISSENTING OPINION BY WATKINS, J.:

I would arrest judgment as to the defendant, Joseph E. Yobbagy, on the ground that the evidence of conspiracy was insufficient to sustain the guilty verdict of the jury. The evidence necessary to prove a criminal conspiracy must rise above mere suspicion or possibility of guilty collusion, and the evidence in this record, upon which this conviction is based, is only mere suspicion and possibility of collusion. *Com. v. Burdell,* 380

Pa. 43, 110 A. 2d 193 (1955). This is another example where the crime of conspiracy is being used as a catchall when the prosecution is unable to prove a specific crime. *Com. v. Fabrizio*, 197 Pa. Superior Ct. 45, 58, 176 A. 2d 142 (1961).

MONTGOMERY, J., joins in this dissent.