Commonwealth *v.* Horvath, Appellant.

Argued June 18, 1958. Before RHODES, P. J., GUN-
THER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.
(HIRT, J., absent).

Before

WOODRING, J.

*Justin D. Jirolanio,* for appellant.

*Andrew L. Herster, Jr.,* Assistant District Attorney, with him *Edward G. Ruyak,* District Attorney, for appellee.

OPINION BY ERVIN, J., September 11, 1958:

Defendant, Rudy Horvath, has appealed from sentences on two conspiracy indictments, after the dismissal of his motions in arrest of judgment and for a new trial.

The evidence, considered in the light most favorable to the Commonwealth: *Com. v. Mitchell,* 181 Pa. Superior Ct. 225, 227, 124 A. 2d 407, may be summarized as follows:

### 1955 Pontiac Station Wagon

Olive Karabin, girl friend of the defendant, owned a 1955 Pontiac station wagon. In May 1956, while the partnership of Stevens and Hill was still in existence, Harvey Murray became interested in purchasing this station wagon, which had been placed on the used car

lot of Stevens and Hill for sale by the defendant with the knowledge and consent of Karabin. Hill and Murray finally agreed upon a purchase price and possession of the automobile was delivered to Murray. Murray made arrangements at the Union Bank and Trust Co. for a loan to finance the purchase. The bank gave three checks to Murray, one to cover insurance, one to General Acceptance Corporation covering the balance still owing on an encumbrance which Murray had on his Ford, which he was trading in, and a third check to cover the purchase of the Pontiac, made payable to S & H Motor Company. The latter check was accompanied by a memorandum of encumbrance which the bank desired noted on the assigned certificate of title. Murray delivered the check payable to S & H Motor Company and also delivered to them a certificate of title for the trade-in Ford, which he had assigned in blank. Hill testified that he sold Murray's 1954 Ford for $1,500.00 and used this money in the business, as he was instructed to do by the defendant. Hill also admitted receiving the check from the Union Bank and Trust Co. on May 24, 1956, which he cashed. He said that he offered the cash to the defendant, who told him to use it instead to buy out his partner, John Stevens. Petty, the bank officer, testified that around October 17 or 24 he attempted to phone Miss Karabin. Within five minutes defendant telephoned Petty and said he was under the impression that Petty was trying to get in touch with Miss Karabin. Defendant then told Petty, "Well, you stay the hell away from her. That's my car, and if you have anything to do with it, you see Attorney Rybak." Hill testified that he formed an actual partnership with the defendant around June 5, 1956. Officer Good testified that on September 4, 1956 he had a conversation with the defendant and that he admitted that he was a silent partner with Hill

in the Auto Spot business. On or about October 12, 1956, the Pontiac was taken from Murray by Constable Lipko after Murray had been threatened and coerced by arrest for surety of the peace[1] allegedly committed against Lipko and defendant, who posed as Lipko's brother. Murray never did get title to the Pontiac station wagon nor did the bank get an encumbrance noted on the title certificate for its loan. Karabin never did assign the title to Murray, presumably because she was never paid for the station wagon, the money having been used for the benefit of Hill and the defendant. Murray lost his Ford which had been traded in on the deal.

### 1956 Chevrolet

Hill testified that on the day the 1956 Chevrolet was purchased from Town Auto he and the defendant were out looking for a car to buy and as part payment were willing to trade a 1950 Buick which they had at the Auto Spot lot. They looked at the 1956 Chevrolet and the defendant told Hill that maybe Miss Karabin would like to buy it, that if she didn't take the car it could go to the Auto Spot to be sold. The car was immediately taken to the car lot for sale. Hill testified that Miss Karabin told the defendant and him that she didn't like the 1956 Chevrolet. Ronald Hottle testified that he first met defendant at the Auto Spot sales lot on September 1, 1956, advising Horvath that he was interested in the purchase of the 1956 Chevrolet which had been placed on the lot for sale. Defendant said the car was for sale and that he bought it for his girl friend Karabin and that she did not want the car. Horvath told Hill that he should appraise Hottle's 1951 Chevrolet while Horvath took Hottle for a demonstration ride. A few days later Hottle agreed, in the

---

[1] The surety of the peace charge was never prosecuted.

presence of the defendant, to purchase the 1956 Chevrolet for $2,000.00 cash plus the trade-in value of Hottle's 1951 Chevrolet of $1,295.00. Horvath fixed the terms of the purchase and gave Hottle the keys to the 1956 Chevrolet and told Hottle that he would receive a new car warranty and a free 1000-mile check up. Hottle signed the title certificate in blank and gave Hill a $10.00 deposit in the presence of the defendant. Hill and Hottle went to the First National Bank and Trust Co. of Bethlehem and Hill told the bank officer that the car was free from encumbrances, whereupon the bank gave an $1,800.00 check to Hottle, who endorsed it to Hill. Officer Good testified that the 1956 Chevrolet had been entitled to Miss Karabin on June 29, 1956 with an encumbrance noted of $2,831.04 in favor of General Acceptance Corporation. When the check for $1,800.00 was delivered by the bank, Hill said that he would see that the bank received the title to the car. Hill further testified that Hottle's two deposits were used in the business of the Auto Spot and that from the $1,800.00 received from the bank and Hottle, he paid $1,050.00 on the 1956 Chevrolet encumbrance, gave defendant $100.00 and used the balance to clear title on a 1955 Plymouth (another car owned by the partnership but not involved in this transaction). The 1956 Chevrolet was later repossessed from Hottle by General Acceptance Corporation. Hottle never did get title to the 1956 Chevrolet nor did the bank get an encumbrance noted on the title certificate for its loan. Karabin never did assign the title to Hottle, presumably because she was never paid for the 1956 Chevrolet, the money having been used for the benefit of Hill and the defendant. Hottle lost his 1951 Chevrolet, which had been traded in on the deal and the $200.00 cash payment.

Both automobiles, the 1955 Pontiac and the 1956 Chevrolet, continued to be owned by Miss Karabin at the time of trial.

Hill plead guilty and testified at the trial as a witness for the Commonwealth. The court sustained a demurrer as to Miss Karabin at the conclusion of the Commonwealth's case.

The first contention of the appellant is that the evidence was not sufficient to justify a conviction. The elements of conspiracy to do an unlawful act are a combination of two or more persons, with criminal intent or corrupt motive, to do a criminal or unlawful act, or an act not in itself unlawful, by criminal or unlawful means: *Com. v. Gaines*, 167 Pa. Superior Ct. 485, 75 A. 2d 617. The offense of conspiracy is complete the moment the parties agree to do an unlawful thing: *Com. v. Ricci*, 177 Pa. Superior Ct. 556, 112 A. 2d 656. No explicit, formal agreement need be shown in proving a criminal conspiracy: *Com. v. Dunie*, 172 Pa. Superior Ct. 444, 94 A. 2d 166. The heart of every conspiracy is a common understanding, no matter how it comes into being. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities: *Com. v. Strantz*, 328 Pa. 33, 195 A. 75. A conspiracy may be inferentially established by showing the relation, conduct, or circumstances of the parties, and the overt acts on the part of co-conspirators have uniformly been held competent to prove that a corrupt confederation has in fact been formed: *Com. v. Rosen*, 141 Pa. Superior Ct. 272, 14 A. 2d 833. There was ample evidence produced by the Commonwealth to permit the jury to find that there was an understanding or agreement between Hill and the defendant to represent to the victims that the two auto-

mobiles were for sale and that a clear title could be given therefor. There was also ample evidence to permit the jury to find that Hill and the defendant intended to procure the victims' money and trade-in cars and that they never intended to clear the encumbrances and to turn over the net proceeds to the owners of the cars; that Hill and the defendant intended to convert the proceeds of the sales to their own direct use and benefit. Not only was there an agreement between these two persons to accomplish the above but the evidence clearly reveals that these purposes were actually accomplished. As a result, the victims and the banks were misled by a misrepresentation of existing facts and were actually defrauded of their property and money.

The principal contention of the appellant is that declarations of Hill were inadmissible against the defendant Horvath "in the absence of independent proof of conspiracy." Appellant has attempted to apply a principle of law which is entirely inapplicable to these cases. He quotes from Henry Pennsylvania Evidence, 4th Ed., Vol. 1, page 438, as follows: "Before declarations of one of alleged conspirators are admissible against the others, there must be proof, aside from the declarations themselves, of the existence of a conspiracy." In the present case we are not concerned with an extra-judicial declaration made by Hill either before, during or after the perpetration of the crime of conspiracy. At the beginning of the chapter above quoted from, at page 432, the author states: "As a general rule, oral or written statements, made by a person not called as a witness and therefore without the sanction of an oath or opportunity for cross-examination, are inadmissible." See also *Com. v. Chuing*, 150 Pa. Superior Ct. 445, 28 A. 2d 710.

In the present case Hill testified as a Commonwealth witness and gave direct testimony implicating the defendant. There was, of course, no violation of the hearsay rule. The witness was subject to cross-examination by defendant's counsel. This alone is sufficient to dispose of appellant's argument. Even if we should consider Hill's testimony as amounting to extra-judicial declarations, there was sufficient evidence aside from his testimony to prove the corpus delicti. The evidence presented by the victims, bank officers, police officer, and the defendant himself, was sufficient to prove the corpus delicti. The corpus delicti in any case is sufficiently established in this Commonwealth by showing (1) a specific injury or loss and (2) somebody's criminality, as a source of the injury or loss: *Com. v. Dolph,* 164 Pa. Superior Ct. 415, 419, 65 A. 2d 253. See also *Com. v. Winter,* 174 Pa. Superior Ct. 35, 37, 98 A. 2d 221. The surrounding facts in the two cases at bar were sufficient to warrant a finding by the jury that a conspiracy existed between Hill and the defendant. Consequently, the declarations, admissions and activities of each of the parties were admissible against the other. *Com. v. Rhey,* 140 Pa. Superior Ct. 340, 349, 14 A. 2d 192. That the accused was not present when the declaration which is introduced against him was uttered by a fellow-conspirator does not of necessity render it incompetent if it was made or done during the existence of the conspiracy and in furtherance of its objects. It is then considered as original evidence against all the others. *Com. v. Jermyn,* 101 Pa. Superior Ct. 455, 471. The question whether or not proof of the conspiracy shall precede the admission of evidence of acts and declarations of supposed co-conspirators is merely one of order of proof, which is a matter largely in the discretion of the trial court: *Com. v. Zuern,* 16 Pa. Superior Ct. 588; *Com. v. Jermyn,* supra, at page 471.

Appellant also contends that he was unduly restricted in his cross-examination of Hill. He wanted to show that Hill had engaged upon a course of conduct in other matters in which he defrauded buyers and finance companies in connection with the sale of cars. It was already clear to the jury that Hill had plead guilty to conspiracy in the two matters then being tried. In his charge to the jury Judge WOODRING called attention to the corrupt source of this testimony and duly cautioned the jury to scrutinize it with special care. This is all the appellant was entitled to. To permit cross-examination in the other matters would not have added anything to what the jury already knew and would have unduly prolonged the trial. The scope of cross-examination is a matter largely within the discretion of the trial court: *Berkley v. City of Jeannette,* 373 Pa. 376, 96 A. 2d 118; *Pantano v. Zamer Motor Sales Co.,* 170 Pa. Superior Ct. 317, 85 A. 2d 681. We are convinced that the lower court did not abuse its discretion in this connection.

Judgments of sentence affirmed and it is ordered that appellant appear in the court below at such time as he may there be called and that he be by that court committed until he has complied with his sentence or any part thereof which had not been performed at the time the appeal was made a supersedeas.