393 A.2d 397

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Kevin HOLMES, Appellant (two cases).**

Supreme Court of Pennsylvania.

Argued Jan. 19, 1978.

Decided Oct. 5, 1978.

Stanley Bashman, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Deputy Dist. Atty. for Law, Glen S. Gitomer, Philadelphia, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

Kevin Holmes was convicted in a nonjury trial in Philadelphia of murder of the third degree, aggravated assault, robbery, and conspiracy. Post-verdict motions were denied and concurrent judgments of sentence of not less than two nor more than ten years imprisonment on each indictment were imposed. These appeals followed.[1]

Appellant challenges the sufficiency of the evidence to sustain the convictions.

"The test of sufficiency of the evidence is whether, accepting as true all the evidence and reasonable inferences therefrom, upon which, if believed, the factfinder could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime or crimes of which he has been convicted."

*Commonwealth v. Hamm,* 474 Pa. 487, 494, 378 A.2d 1219, 1222 (1977). Further, we must consider the evidence in the

1. The appeal from the judgment of sentence imposed on the murder conviction was filed in this Court. An appeal from the judgments of sentence imposed on the other convictions was filed in the Superior Court and certified here.

light most favorable to the Commonwealth. *Commonwealth v. Hamm,* supra; *Commonwealth v. Bryant,* 461 Pa. 309, 336 A.2d 300 (1975). So viewed, the trial record discloses the following:

James Holmes, brother of appellant, and Bernard Petty entered the front door of the Hunt Room Bar at 18th and South Streets in Philadelphia on October 25, 1975, shortly after 11:30 p. m. The two proceeded to a washroom in the rear of the bar where they remained for a few minutes. When the two came out of the washroom, they proceeded toward the front of the bar. As James Holmes passed a patron, Jessie Wallace, he pointed a gun at Wallace's head and said: "This is a stickup." James Holmes then seized Wallace. When several female patrons began to scream, Petty ran toward the front door. James Holmes began to pull Wallace toward the front door. He then fired a shot at Petty and turned toward Wallace, who was falling to the floor, and fired a shot at him. The first shot struck Petty; the second struck Holmes' hand and then Wallace. Both Petty and James Holmes then fled the bar.

The evidence linking appellant to the above events consisted of a statement made by him to a police officer and recorded in the handwriting of the police officer. This statement, when completed, was signed by appellant and was later introduced into evidence at trial. This statement was both exculpatory and inculpatory. But in determining the sufficiency of the evidence, we must, as previously mentioned, view the evidence in the light most favorable to the Commonwealth, *Commonwealth v. Hamm,* supra, and, as applied to this statement, this means we must accept only those portions which inculpate appellant and treat those portions which exculpate him as disbelieved because the factfinder could believe all, part, or none of the statement. *Commonwealth v. Long,* 467 Pa. 98, 354 A.2d 569 (1977). So viewed, Holmes' statement detailed the following:

Prior to the robbery, appellant was riding in a car along with Petty, James Holmes, and Rob,[2] who was the driver,

2. Rob was never further identified.

when "Jimmy talks about stickin-up, robbery, and he says Kevin you go'ne in with me. And I says no I ain't go'ne in nowhere, take me home . . .. Petty [then] say, I'll go with you." Appellant knew his brother had a gun. When the car arrived at a restaurant on West Oak Lane, James Holmes and Petty left the car and entered the restaurant to "make some money." They returned to the car without doing so because the restaurant was too crowded. The four then proceeded to a friend's residence to borrow money, but the friend was not home. They then proceeded "around the corner to where the [two] bars" were located. James Holmes entered one of the bars by himself "to see if [he could] get some money . . .." He came back out and Petty then entered with him. They remained in the bar for five minutes and then returned to the car. Either Petty or James Holmes then remarked: "We gonna take this other bar across the street." They entered that bar and the attempted robbery and shooting, previously related, took place.

When Petty and James Holmes returned to the car, James Holmes told appellant to "break the car light," but he refused. Rob then told appellant to "break" the car lights and he did so. The four then proceeded to 18th and Montgomery where James Holmes got out of the car. The remaining three went to a hospital where Petty and appellant entered. Rob departed in the car. Later, appellant was informed by someone at the hospital that Petty was dead.

Appellant also said in the statement that James Holmes' only explanation for shooting Petty was: "That m_____ f_____ coward, I might of shot him." When asked, "Why did you go along," appellant said in the statement ". . . one reason was I was scared of Jimmy, and the other reason was if we got some money I was gonna get some and if he got the money he was gonna get a coat for us."

Appellant does not dispute the sufficiency of the evidence to establish that James Holmes and Bernard Petty entered the bar at 18th and South Streets at 11:45 p. m. on October 25, 1975, with the intent to commit a robbery and

that, during the robbery, James Holmes shot Jessie Wallace and fatally shot Bernard Petty. Rather, appellant contends the evidence is insufficient to establish that he was an accomplice of and co-conspirator with James Holmes, the grounds upon which his criminal liability is based. We cannot agree.

18 Pa.C.S.A. § 306(c) (1973) provides:

"A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

* * * * * *

(ii) aids or agrees or attempts to aid such other person in planning or committing it."

Instantly, the factfinder could have found beyond a reasonable doubt that appellant had the intent of promoting or facilitating the commission of the robbery, and could also have found beyond a reasonable doubt that he aided or agreed or attempted to aid James Holmes in committing the robbery. These findings were warranted by the following undisputed facts: Appellant knew that James Holmes had a gun and intended to commit a robbery; appellant remained in the car with his brother while various locations were examined as potential targets of the robbery; appellant expected to and would have shared in the proceeds of the robbery; appellant remained in the car while James Holmes and Petty entered the Hunt Room Bar; and, appellant broke the car lights to aid in effecting an escape. Hence, the Commonwealth's evidence was sufficient to establish appellant was an accomplice.

Furthermore, 18 Pa.C.S.A. § 903(a) (1973) provides: "A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime."

In establishing a conspiracy, direct proof of an explicit or formal agreement is not required. *Commonwealth v. Roux,* 465 Pa. 482, 350 A.2d 867, 870 (1976). Moreover,

"while more than mere association must be shown, '[a] conspiracy may be inferentially established by showing the relation, conduct or circumstances of the parties, and the overt acts on the part of co-conspirators have uniformly been held competent to prove that a corrupt confederation has in fact been formed.'"

*Commonwealth v. Roux,* supra, 465 Pa. at 488, 350 A.2d at 870, quoting from *Commonwealth v. Horvath,* 187 Pa.Super. 206, 211, 144 A.2d 489, 492 (1958). We are convinced the evidence which established appellant was an accomplice also provides a basis from which the finder of fact could have concluded beyond a reasonable doubt that he was a co-conspirator. See *Commonwealth v. Roux,* supra; *Commonwealth v. Roman,* 465 Pa. 515, 351 A.2d 214 (1976).

Appellant argues his trial counsel was ineffective for failing to preserve the following issues in regard to the admissibility of his statement for review on appeal:[3] 1) whether the statement was the product of an illegal arrest;[4] and, 2) whether the statement was the product of unnecessary delay between arrest and arraignment.[5]

"In resolving this contention we are guided by the standard set forth in *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 604, 235 A.2d 349, 352 (1967):

**3.** Trial counsel was replaced by new counsel following imposition of the judgments of sentence; hence, the issue of trial counsel's effectiveness may now be raised in this direct appeal. *Commonwealth v. Dancer,* 460 Pa. 95, 331 A.2d 435 (1975).

**4.** This issue was raised pretrial, but not in post-verdict motions; hence, under *Commonwealth v. Bronaugh,* 459 Pa. 634, 331 A.2d 171 (1975), the issue was not preserved for review on appeal.

**5.** This issue was not raised pretrial; hence, it is not reviewable on appeal. See Pa.R.Crim.P. 323(b).

'[C]ounsel's assistance is deemed constitutionally effec-
tive once we are able to conclude that the particular
course chosen by counsel had *some reasonable basis*
designed to effectuate his client's interests.'

The initial factor which must be considered in applying
this reasonable basis standard is whether the claim which
. . . counsel is charged with not pursuing had some
reasonable basis. In [Washington] we noted that 'a find-
ing of ineffectiveness could never be made unless we
concluded that the alternatives not chosen offered a po-
tential for success substantially greater than the tactics
actually utilized.' *Commonwealth ex rel. Washington v.
Maroney*, 427 Pa. at 605 n. 8, 235 A.2d at 353. [If counsel
does not] assert a baseless claim, [he] cannot be found to
have been ineffective for failing to [pursue it]. See, e. g.,
*Commonwealth v. Nole*, 461 Pa. 314, 336 A.2d 302 (1975);
*Commonwealth v. Harrison*, 228 Pa.Super. 42, 323 A.2d
848 (1974); cf. *Commonwealth v. Goosby*, 461 Pa. 229, 336
A.2d 260 (1975); *Commonwealth v. Rice*, 456 Pa. 90, 318
A.2d 705 (1974). It is only when the claim [is] . . .
of arguable merit that we must make an inquiry into the
basis for . . . counsel's decision not to pursue [or
raise] the matter. Thus the starting point of our inquiry
is whether there were reasonable grounds upon which to
[challenge the admissibility of the statement for either or
both of the reasons appellant now complains should have
been done].

"We emphasize that our analysis of the abandoned
claim[s] is undertaken solely for the purpose of resolving
questions of ineffective representation."

*Commonwealth v. Hubbard*, 472 Pa. 259, 277–78, 372 A.2d
687, 695–96 (1977).

The circumstances surrounding the obtaining of the state-
ment are as follows:

After being informed that Petty was dead, appellant went
to the home of Petty's .mother and informed her of his

death.[6] Petty's mother and appellant then returned to the hospital. While there, a police officer asked appellant what happened, and he responded:

"I don't really know what happened. My friend, my brother to the bar. [sic] I heard shots and I see my friend coming down and heard some shots. My friend [Petty] fell down.

\* \* \* \* \* \*

"[M]y brother came out and grabbed—picked Petty up and then I saw another guy come behind him and come— Bumpy or some name like that.

\* \* \* \* \* \*

"I was in the car."

He also told the officer that Petty got in the car and was taken to the hospital. The officer asked appellant if he saw any faces, and he responded that he did not, but that he did see a "[h]eavy-set guy around at the bar, [a]nd . . . heard him call the name Bumpy to him."

Appellant accompanied by a female friend, then went voluntarily[7] to the Police Administration Building in a police car to "find out who shot [Petty]" and to assist in the investigation. Upon arriving there shortly before 1:52 a. m. on October 26, 1975, he and his companion sat on a bench near the front door.

In between answering telephones, a Detective Kane took an exculpatory statement from appellant at approximately 1:52 a. m. While taking the statement, Kane received a phone call from Detective Hedgman who was at the scene of the crimes and who advised him that the shooting had taken place in the Hunt Room Bar at 18th and South Streets. During the interview, appellant told Kane that he helped

6. The trial testimony established that this occurred at 12:30 a. m. on October 26, 1975.

7. Appellant testified that the officer did not tell him he had to go in the car; that he went to find out who shot Petty; that no conversation took place while in the car; that he did not consider himself arrested; that he was not handcuffed; and, that the officer had told him he would return them to the hospital.

Petty into the car and helped transport him from the bar at 18th and South Streets to the hospital after Petty was shot in the bar. Further, appellant told Kane his brother ran west on South Street. After this interview was completed, Kane told appellant to return to the bench he had been sitting on with his companion. Thereafter, Kane received another phone call from Hedgman who advised Kane that the shooting had occurred during the course of a robbery at the bar; that Petty had been shot while participating in the robbery; and, that Petty and the accomplice, who shot him, had been observed getting into an automobile which had been occupied by two other males and which had proceeded north.

Because appellant had not mentioned a robbery in his exculpatory statement to Kane, and because of the other information he received from Hedgman, Kane told appellant sometime after 3:00 a. m.[8] to sit in an interrogation room and someone would be in to speak with him. Kane then escorted appellant to the room and locked the door.[9] Kane testified that this action by him represented a change in appellant's status from that of a witness to that of a person "more or less involved in the crime." Kane later re-entered the room to tell appellant to stop banging on the door and someone would be in to speak with him.

At 6:30 a. m., Detective Strohm entered the interrogation room, "formally arrested" appellant for murder, and advised him of his constitutional rights which appellant waived. Appellant then gave the statement, at issue herein, which was concluded, reduced to writing, and signed by appellant by 8:30 a. m.

8. The exact time cannot be determined from the record, but the record does show that appellant was still on the bench by the front door at 3:00 a. m.

9. While Kane testified that appellant was not free to leave while on the bench, no restraints of any sort had been placed on appellant and he was not aware, prior to going into the interrogation room, of Kane's viewpoint that he was not free to leave.

The information, which led to the formal arrest of appellant, was gathered by Strohm from an interview with one victim, Wallace, from other police officers, who had interviewed eyewitnesses, and from officers, who had spoken with appellant, and can be summarized thusly:

Appellant had arrived at the hospital with Petty and another male in an older model white automobile. Appellant had told police officers that his brother, James, had also been shot at the bar on South Street and had run west on that street. Two persons, one of whom had been identified by police as James Holmes, brother of appellant, had entered the Hunt Room Bar and attempted a robbery and, during the course of the robbery, James Holmes shot Petty and Wallace. James Holmes and Petty fled the bar and entered an older model white automobile already occupied by two males which then proceeded north on 18th Street.

Initially, we must determine when appellant was arrested. Appellant argues the arrest occurred about 1:52 a. m. when Kane told him to sit on the bench. The argument is founded on testimony by Kane to the effect that he did not consider appellant free to leave the Police Administration Building while he was seated on the bench.

In *Commonwealth v. Bosurgi*, 411 Pa. 56, 68, 190 A.2d 304, 311 (1963), quoting from 5 Am.Jur.2d, Arrest § 1, p. 695, we said:

"[a]n arrest may be accomplished by 'any act that indicates an intention to take [a person] into custody and that subjects him to the actual control and will of the person making the arrest.' "

See also *Commonwealth v. Richards*, 458 Pa. 455, 327 A.2d 63 (1974).

Instantly, Kane performed no act which indicated he was taking appellant into custody, nor was appellant subjected to the control and will of Kane when appellant was told to be seated on the bench. Furthermore, Kane's subjective view

that appellant was not free to leave is of no moment absent an act indicating an intention to take appellant into custody. Thus, we reject the argument that the arrest occurred at 1:52 a. m.

 Alternatively, appellant argues the arrest took place sometime after 3:00 a. m.[10] when Kane escorted appellant to the interrogation room and locked the door. With this, we are in agreement.[11] Clearly, a police officer escorting a person to a room and then locking the door to the room constitutes an act showing an intention to place a person in custody and subjecting him to the control and will of the officer.

 Next, appellant argues the arrest was illegal because it was made without probable cause. In *Commonwealth v. Dickerson*, 468 Pa. 599, 605, 364 A.2d 677, 680 (1975), we said:

> "Probable cause has been defined as those facts and circumstances available at the time of the arrest which would justify a reasonably prudent man in the belief that a crime has been committed and that the individual arrested was the probable perpetrator."

We believe the facts and circumstances known to Kane at the time of arrest were adequate to establish probable cause for the arrest. Kane knew from investigating officers at the bar that Petty had been shot by an accomplice in the course of an attempted robbery at the bar and that Petty and the accomplice fled the scene in an automobile occupied by two other males. He knew from appellant's 1:52 a. m. statement that he had helped transport Petty from the bar to the hospital and that appellant had not mentioned a robbery in the statement. Based on these facts, a reason-

10. See n. 8 supra.

11. The suppression court ruled the arrest did not take place until 6:00 a. m. As the text indicates, we disagree with the suppression court regarding the time of arrest.

ably prudent man would be justified in formulating a belief that appellant assisted the perpetrators of the robbery in fleeing the scene and was an accomplice to the robbery. See *Commonwealth v. Garnett*, 458 Pa. 4, 326 A.2d 335 (1974); *Commonwealth v. Negri*, 414 Pa. 21, 198 A.2d 595 (1964); *Commonwealth v. Bosurgi*, supra. We conclude the arrest was based on probable cause and thus was legal. *Commonwealth v. Bosurgi*, supra.

▇ Since the arrest of appellant was legal, the failure of counsel to raise in post-verdict motions the issue of the statement's admissibility on the ground that it was the product of an illegal arrest cannot provide a basis for finding counsel ineffective. *Commonwealth v. Hubbard*, supra.

▇ Neither is there merit to the complaint of counsel's failure to raise in pretrial motions the issue of the admissibility of the statement on the ground that it was the product of unnecessary delay between arrest and arraignment. Since the arrest occurred at 3:00 a. m. at the earliest, and since appellant began the statement at 6:30 a. m., the total amount of delay involved is less than three and one-half hours. See *Commonwealth v. Goodwin*, 460 Pa. 516, 333 A.2d 892 (1975); *Commonwealth v. Rowe*, 459 Pa. 163, 327 A.2d 358 (1974). Cf. *Commonwealth v. Boone*, 467 Pa. 168, 354 A.2d 898 (1975). Such a short period of delay has never been considered offensive to the requirement of a speedy arraignment. See *Commonwealth v. Boone*, supra. Cf. *Commonwealth v. Young*, 460 Pa. 598, 334 A.2d 252 (1975). Thus, the failure of counsel to raise a *Futch*[12] claim which is without merit pretrial cannot provide a basis for finding him ineffective. *Commonwealth v. Hubbard*, supra.

Judgments of sentence affirmed.

NIX, J., concurs in the result.

12. *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1972).