411 A.2d 221

COMMONWEALTH of Pennsylvania,

v.

William Harvey MITCHELL, Appellant.

Superior Court of Pennsylvania.

Submitted Dec. 14, 1977.

Filed Sept. 28, 1979.

Margaret H. Poswistilo, Assistant Public Defender, Easton, for appellant.

John E. Gallagher, District Attorney, and with him Allan B. Goodman, Assistant District Attorney, Easton, for Commonwealth, appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

CERCONE, President Judge:

Appellant, William Harvey Mitchell, and a co-defendant, Gordon R. Johnson, were each charged with separate counts of burglary,[1] criminal attempt,[2] and conspiracy.[3] Following a joint jury trial, Johnson[4] was found guilty of all charges while appellant was acquitted of burglary and criminal

---

1. The Crimes Code, Act of December 6, 1972, P.L. 1482, No. 334, 18 Pa.C.S. § 3502.

2. The Crimes Code, supra; 18 Pa.C.S. § 901.

3. The Crimes Code, supra; 18 Pa.C.S. § 903.

4. Johnson is not a party to this appeal.

attempt but convicted of conspiracy. Appellant maintains, inter alia, that the evidence was insufficient[5] to sustain his conviction on the charge of conspiracy.

"[T]he test of the sufficiency of the evidence—irrespective of whether it is direct or circumstantial, or both—is whether, accepting as true all the evidence and all reasonable inferences therefrom, upon which if believed the jury could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime or crimes of which he has been convicted." *Commonwealth v. Frye*, 433 Pa. 473, 481, 252 A.2d 580, 584 (1969). Moreover, it is well settled that the Commonwealth, as verdict winner, is entitled to have the evidence considered in a light most favorable to it. *Commonwealth v. Long*, 460 Pa. 461, 333 A.2d 865 (1975).

So viewed, the record discloses the following. On the evening of March 29, 1976, at approximately 11:31 P.M., two officers of the Easton Police Department responded to a silent burglar alarm which had been activated at the Wolf Elementary School. As the officers approached the school by automobile they observed appellant and Johnson emerging from the school grounds. Both men identified themselves upon being stopped by the officers. Appellant informed the police they were taking a short cut. The men were then released and the officers proceeded to the school where they discovered a broken window at the rear of the building. Further investigation inside the school revealed

5. Appellant presents this contention in terms of whether the trial judge erred in refusing to grant his demurrer to the evidence. However, appellant did not rest following this adverse ruling but proceeded to present evidence in his defense and, therefore, the correctness of this ruling has not been preserved for review. *Commonwealth v. Warren*, 475 Pa. 31, 379 A.2d 561 (1977); *Commonwealth v. Ilgenfritz*, 466 Pa. 345, 353 A.2d 387 (1976). "We have chosen, nevertheless, to treat the question as if properly framed, namely, whether the trial court erred in refusing [appellant's] motion in arrest of judgment. In doing so, of course, we consider all of the evidence, not only that contained in the Commonwealth's case in chief." (Citations omitted.) *Commonwealth v. Ilgenfritz*, supra, 466 Pa. at 347–48, 353 A.2d at 388–389 n.*. See also, *Commonwealth v. Duncan*, 473 Pa. 62, 373 A.2d 1051 (1977); *Commonwealth v. Warren*, supra.

that several thousand dollars worth of school equipment, including some television sets, had been placed near an unlocked, outside door on a first floor landing of the building. The school custodian testified that he had locked this door at approximately 7:00 o'clock that evening and that the building was secure at that time. A supervisor testified that it would take two men to carry one of the larger TV sets and that it would require about forty-five minutes to one hour to stack all of the items near the door. A fingerprint found on one of the television sets was identified as belonging to Johnson.

The testimony of various other witnesses, both for the prosecution and for the defense, established that appellant and Johnson had been seen together at a basketball game at the local high school earlier that evening from approximately 7:30 P.M. to 10:30 P.M. It was further established that it would take five to ten minutes to drive from the high school to the site of the crime. The investigating officers stated that they arrived at the school grounds within a "matter of seconds" of the 11:31 P.M. call notifying them that the silent alarm had been triggered.[6] Upon arrival, as previously noted, they saw appellant and Johnson coming out of a driveway or alley leading from the school area. Appellant and Johnson were also observed together one hour after their encounter with the police. Although appellant did not testify, Johnson took the stand and stated that after the basketball game he and appellant, accompanied by two women they had escorted to the game, left the high school and drove to Phillipsburg to take one of the women home. The two men and the remaining woman then proceeded to a tavern near the elementary school. At about 11:15 P.M. Johnson and appellant, in accordance with a previous arrangement, walked outside the bar to await the arrival of Johnson's sister in order to return the car which Johnson had borrowed from her earlier that day. When she arrived, at approximately 11:20 P.M., she informed her brother that her

6. The silent alarm at the school is triggered when sensors in the building register motion and the police department is then immediately notified via automatic telephone transmission.

other car was not operating properly and she had parked it in a nearby public parking lot.

Johnson and appellant agreed to go over and check the car, whereupon they began walking to the parking lot which was located approximately one block from the scene of the crime. As they were walking down a road adjacent to the school, they were stopped by the police. Five witnesses substantially corroborated Johnson's account of his and appellant's activities during the time period in which the crime occurred.

"To sustain a conviction, the facts and circumstances which the Commonwealth prove must be such that every essential element of the crime is established beyond a reasonable doubt. Although the Commonwealth does not have to establish guilt to a mathematical certainty, and may in the proper case rely wholly on circumstantial evidence, the conviction must be based on more than mere suspicion or conjecture." (Citations omitted.) *Commonwealth v. Roscioli*, 454 Pa. 59, 62, 309 A.2d 396, 398 (1973).

In relevant part, the Crimes Code, supra, § 903(a), states:

"A person is guilty of conspiracy with another person or persons to commit a crime if with the intent or promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime."

The essence of any conspiracy is a common understanding. *Commonwealth v. Holguin*, 254 Pa.Super. 295, 385 A.2d 1346 (1978); *Commonwealth v. Yobbagy*, 410 Pa. 172, 188 A.2d 750 (1963). There must be evidence of an agreement to commit an unlawful act. *Commonwealth v. Adams*, 254 Pa.Super. 62, 385 A.2d 525 (1978). However, "while more

than mere association must be shown, '[a] conspiracy may be inferentially established by showing the relation, conduct or circumstances of the parties, and the overt acts on the part of co-conspirators have uniformly been held competent to prove that a corrupt confederation has in fact been formed." *Commonwealth v. Roux*, 465 Pa. 482, 488, 350 A.2d 867, 870 (1976), quoting from *Commonwealth v. Horvath*, 187 Pa.Super. 206, 211, 144 A.2d 489, 492 (1958).

Instantly, appellant asserts that his conviction cannot stand because mere presence at the scene of the crime is insufficient to establish guilt. See, *Commonwealth v. Garrett*, 423 Pa. 8, 222 A.2d 902 (1966). The Commonwealth, on the other hand, contends the evidence shows much more than appellant's mere presence at the scene. Specifically, the Commonwealth argues that the evidence established Johnson's guilt since a fingerprint of his was found on one of the TV sets and because he was observed in the vicinity of the crime within moments after the silent alarm had been activated. The Commonwealth then proceeds to argue that once it is determined that Johnson was one of the burglars, then the fact that Johnson and appellant were virtually in continuous company during the night in question justifies the inference that appellant was a co-conspirator in the crime.

The Commonwealth's evidence was insufficient, as a matter of law, to conclude beyond a reasonable doubt that appellant was part of a conspiracy to burglarize the school. The record, read in the light most favorable to the Commonwealth, merely establishes appellant's association with Johnson on the night of the crime and their presence in the vicinity of the crime immediately after its occurrence.[7] Cf. *Commonwealth v. Garrett*, supra. The testimony, however, is devoid of any indication that appellant counseled or par-

---

7. It must be emphasized that although the investigating detective lifted numerous latent fingerprints at the scene, none of the prints were appellant's. Indeed, the Commonwealth's expert witness could only identify one partial print as that of Johnson's, and there was no testimony as to when that print had been impressed. See *Commonwealth v. Cichy*, 227 Pa.Super. 480, 323 A.2d 817 (1974).

ticipated in the burglary. See *Commonwealth v. Fields*, 460 Pa. 316, 333 A.2d 745 (1975). Such a conclusion would be sheer conjecture. To infer appellant's complicity on the basis of his companionship with Johnson, would be tantamount to determining guilt by association. See *Commonwealth v. Cox*, 460 Pa. 566, 333 A.2d 917 (1975). Under the circumstances, the Commonwealth's proof left too much to speculation and conjecture. See *Commonwealth v. Finley*, 477 Pa. 382, 383 A.2d 1259 (1978).

Reverse the judgment of sentence and appellant is discharged.

WATKINS and HOFFMAN, JJ., join in this opinion.

SPAETH, J., files a concurring and dissenting opinion.

PRICE, J., files a dissenting statement.

VAN der VOORT, J., files a dissenting opinion.

JACOBS, J., did not participate in the consideration or decision of this case.

SPAETH, Judge, concurring and dissenting:

I concur in the first part of the order entered by the majority, vacating the judgments of sentence. However, I dissent from the second part, discharging appellant. I believe that the evidence was sufficient to support appellant's conviction of conspiracy, and that appellant's motion in arrest of judgment was therefore properly denied. I also believe that the district attorney improperly questioned appellant's co-defendant about why he and appellant were silent when accused by the police, and further, improperly commented on that silence in closing to the jury, and that appellant's motion for a new trial should therefore be granted.

### −The Motion in Arrest−

While appellant presents his sufficiency argument in terms of whether the trial judge should have granted his demurrer to the evidence, he did not rest after the judge refused to grant the demurrer but instead proceeded to

present a defense. Accordingly, in considering whether the evidence was sufficient, we must consider not only the evidence presented by the Commonwealth in its case-in-chief but all of the evidence, including that offered in defense. *See Commonwealth v. Ilgenfritz*, 466 Pa. 345, 347–48, 353 A.2d 387, 388–89 (1976).

In testing the sufficiency of the evidence, "we first accept as true all the evidence upon which the finder of fact could properly have reached its verdict, and then, after giving the Commonwealth the benefit of all reasonable inferences arising from that evidence, we ask whether the evidence and the inferences arising from it are sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crimes of which he has been convicted." *Commonwealth v. Steward*, 263 Pa.Super. 191, 199, 397 A.2d 812, 815–16 (1979); *see Commonwealth v. Holmes*, 482 Pa. 97, 393 A.2d 397 (1978); *Commonwealth v. Madison*, 263 Pa.Super. 206, 397 A.2d 818 (1979). Regarded in this way, the evidence may be summarized as follows.

On March 29, 1976, at 11:31 p. m., Patricia Heidman, a radio dispatcher for the Easton Police Department, received a call from Bell Telephone Alarm Systems that the silent alarm at the Wolf Elementary School had been activated. She immediately called the police patrol car manned by Officers Anthony Cappellano and Charles Otranto. The officers arrived at the school within seconds after the call. As they drove by an alley behind the school they saw two men, appellant and Gordon Johnson, walking along the driveway of the school. Officer Otranto got out of the patrol car, ordered the men to halt, and asked them for identification. He also asked what they were doing there. Appellant identified himself and said, "We are taking a shortcut". Johnson identified himself but said nothing else. After recording the identifications the officers released appellant and Johnson and continued their investigation. They discovered a broken window and an open door at one of the entrances to the school. Entering, they found several television sets, head sets, speakers, and other audio-visual

equipment stacked by the door. A fingerprint lifted from the bottom of one of the television sets was positively identified as belonging to Johnson.

Robert Florey, a supervisor for the Easton Area School District, testified that the equipment found stacked near the door had been taken from various rooms in the school. He also testified that it would have taken two men to carry the largest television set from the classroom where it had been to the door, and estimated that it would have taken the two men approximately forty-five minutes to gather all the items stacked by the door. He explained that the alarm system consisted of various motion sensors scattered throughout the school building, and said that the alarm first sounded at his house at 11:30 p. m.

Robert Deck, a custodian at the school, testified that when he left the school at 7 p. m., the door was locked, the window unbroken, and the equipment in the various school rooms. He testified that in his experience it would have taken two men to carry the largest television set.

Several other witnesses both for the Commonwealth and the defense testified with respect to appellant's and Johnson's movements during the night of the crime. This testimony was that appellant and Johnson had attended a basketball game from approximately 7:30 to 10:30 p. m., at a gymnasium that was a ten minute drive from the school.

Johnson testified as follows. He and appellant had gone to the basketball game with two women in Johnson's sister's tan Volkswagen. After the game they drove one of the women home and went to a bar with the other woman. At approximately 11:15 Johnson's sister came to the bar to get her Volkswagen and told Johnson that her other car, a green Pontiac, had broken down and was parked in the public lot near the Wolf Elementary School. She left in her Volkswagen, and Johnson and appellant started to walk to the public lot to check on the Pontiac. As they were walking by the school, Officer Otranto stopped them. When asked to explain how his fingerprint got on the bottom of the television set, Johnson said he might have touched the set when

he had gone to the school to pick up his nephew, who attended the school in the fall of 1975.

Eugenia Franklin testified that she attended the basketball game with appellant and Johnson and that they had later stopped at the bar. Lucious Hall testified that he met both appellant and Johnson walking along Second Street at approximately 11:20, that he walked with them for a short distance along Second Street until they reached the school, and that there they left him to cut across the school grounds while he continued toward his house on Second Street. A few minutes later, according to Mr. Hall, the police drove up to the school. Billie Johnson, Johnson's sister, testified that she came to the bar at approximately 11:15 to get the Volkswagen and that there she told her brother about the green Pontiac.

On the basis of this evidence the jury could have reasoned as follows: First: Johnson had been in the school building and had carried the large television set. His fingerprint on the underside of the set proved that. Second: Someone must have been with Johnson, for he must have needed help to carry the set. The testimony of the school supervisor and custodian proved that. And third: That someone had been appellant. Appellant had been with Johnson all evening, at the basketball game and bar, and was with him in the driveway of the school minutes after the alarm sounded.

One may imagine various objections to this reasoning, raising issues of fact. None of these, however, is of substance.

The reasoning is inconsistent with Johnson's explanation of how his fingerprint might have gotten on the television set, but the jury was free to reject that explanation as so far-fetched as to be incredible. The jury was also free to reject as incredible the testimony to the effect that appellant and Johnson were taking a short-cut to check on Johnson's sister's green Pontiac. The jury could have regarded all of the testimony that this is what appellant and Johnson were doing as self serving or from biased witnesses.

A question is suggested as to why, if appellant and Johnson were in the school building, the alarm did not sound earlier. However, the jury could have found that the men did not pass one of the motion sensors, and thereby set off the alarm, until they had finished stacking the items near the door and were leaving the building, to get a car to take the items away.

It is true that a finding that appellant and Johnson were in the vacant building for about forty-five minutes, assembling the various items, is necessarily inconsistent with Lucious Hall's testimony that only a few minutes before the alarm sounded, he met appellant and Johnson on Second Street. However, the jury was free to reject Mr. Hall's testimony, for reasons we cannot know. Perhaps the jury thought he had in fact met appellant and Johnson on Second Street, but was mistaken as to the time; or perhaps it concluded from his demeanor that he should not be believed. In any event, this court is not able to say that simply because of Mr. Hall's testimony, the jury was obliged to have a reasonable doubt about the correctness of a finding that appellant and Johnson had been in the school together.

Nor is there any legal objection of substance to the correctness of the jury's finding.

While evidence of mere presence on the scene is not sufficient, *Commonwealth v. Goodman*, 465 Pa. 367, 350 A.2d 810 (1976), here there was much more than evidence of mere presence. Also, evidence of appellant's association with Johnson would not by itself be sufficient to sustain a conviction of conspiracy. *See Commonwealth v. Garrett*, 423 Pa. 8, 222 A.2d 902 (1966). Here, however, there was more than merely evidence of association. First of all, the evidence that appellant was on the scene with Johnson two minutes after the alarm sounded is consistent with appellant's guilt and makes the inference of complicity stronger than in those cases where the accused is discovered in the company of a co-defendant long after the crime has been committed and far away from the scene of the crime. *See Commonwealth v. Cox, supra* (found with co-defendant long after burglary

and far from scene); *Commonwealth v. Frey,* 264 Pa.Super. 212, 399 A.2d 742 (1979) (same). Second, the testimony of the school supervisor and the school custodian was that it would have taken two men to move the largest television set. This evidence makes the case different from *Commonwealth v. Garrett, supra.* In *Garrett,* the victim testified that he was thrown to the ground from behind and robbed while walking across a bridge, and that the only people he saw on the bridge immediately before the attack was a group of four black males. The defendant admitted that he had been one of the group of four but said he had left his three friends before the attack took place. The victim was knocked unconscious during the attack and could not testify as to the number of his attackers. In holding the evidence insufficient the Supreme Court stated: "The victim, while testifying to the presence of four men in the area prior to the attack, was unable to establish the actual number of his assailants. Under the circumstances, the inference that appellant participated in the crime is no more cogent than the version of events contained in his statement [that he had left his friends before the attack]." 423 Pa. at 13, 222 A.2d at 905. In this case, by contrast, the evidence established that the burglary was a two-man job, that Johnson was one of the two, and that appellant, who had been with Johnson throughout the entire night, was the only other man on the scene.

Finally, it is of no significance that the jury convicted Johnson of burglary, criminal attempt, and conspiracy, but convicted appellant of conspiracy only. A jury may render an apparently inconsistent verdict in a criminal case. *Commonwealth v. Carter,* 444 Pa. 405, 282 A.2d 375 (1971); *Commonwealth v. Fox,* 259 Pa.Super. 565, 393 A.2d 970 (1978); *see Commonwealth v. Irvin,* 260 Pa.Super. 122, 393 A.2d 1042 (1978). As long as the evidence was sufficient to sustain appellant's conviction for conspiracy, as here it was, it does not matter that the verdicts of acquittal on the other charges may appear inconsistent. *See Commonwealth v. Love,* 248 Pa.Super. 387, 375 A.2d 151 (1977). One may

surmise that for reasons best known to itself the jury decided to be lenient with appellant. Perhaps it regarded Johnson as the ringleader, and deserving of more punishment. Whatever its reasons, appellant is in no position to complain about the verdict.

–The Motion for New Trial–

As stated above, Johnson testified that the reason he and appellant were walking across the school grounds was to get to his sister's Pontiac, which was parked on a public lot near the school. The district attorney cross-examined Johnson as follows:

Q   All right. I'll rephrase that, Mr. Johnson. Officer Otranto testified that after he yelled, "Halt," and announced, "Police," that before he said anything else as he came up to you and Mr. Mitchell [appellant], that Mr. Mitchell volunteered, "You know me. I'm Harvey Mitchell." Is that not how it happened, sir?

A   I don't know exactly who said what first. I remember Harvey saying, "You know me. I'm Harvey Mitchell," but I don't know exactly how it fell in place, who said what first.

Q   He said that more than one time. Didn't he?

A   No. I believe he said, "You know me. My name is Harvey Mitchell," and then he said, "Well, let me see some I.D."

Q   And you both I.D.'d yourselves?

A   Right. Harvey I.D.'d himself first. He showed him his identification.

A   The officer then asked you what you were doing there. Didn't he?

A   Yes, sir.

Q   You never said anything during this minute or two or three you were together with the officer. Did you?

A   Only thing I said when he asked me who I was, I pulled out my wallet. I said, "Gordon Johnson."

Q   And that was it?

A   That's all I said.

Q   So it was Mr. Mitchell that said, "we're taking a shortcut." Isn't that so?

A   Yeah.

Q   Did either you or he indicate where you were going, that you were going to the car? You were looking for a car to fix on the—

A   No.

Q   Neither of you said that to the police officer?

A   Well, he didn't ask us.

Q   And you didn't think it was important to tell him that?

A   Well, he said, "Where are you going?" I believe that's when Harvey said—

Q   "Where are you going?" Did the officer say "Where are you going?"

A   He just said, "Where are you going," or, "What are you doing here?" And that's when Mr. Mitchell told him that, "We're taking a shortcut through the alley."

Q   And that's all that was said. Is that right?
    MR. SHIELDS: If you recall.

A   That's all I can remember.

Q   The officer also told you why he was checking you out. Did he not? That there had been a burglary at the school.

A   Yes. He did.

Q   He did tell you that?

A   Yes. He did. Yes. He did.

Q   And after he told you that, still neither you nor Mr. Mitchell indicated that your car was down around the corner and you were going to try and start it or fix it. Isn't that correct?
    MR. SHIELDS: Objection, your Honor.
    THE COURT: Overruled.

BY MR. GOODMAN:

Q   Isn't that right?

A   What was the question?

Q   After he told you why he had stopped you, what his concern was for being in the area, there had been a burglary of the school neither you nor Mr. Mitchell indicated that your shortcut was to get down to the parking lot to try and fix this green Pontiac. Neither of you said anything about that.

A   He didn't ask us. No. He didn't.

Q   And you didn't tell him.

A   No.

N.T. 325–28.

At this point counsel for both defendants moved for a mistrial. The trial judge denied the motion, and the district attorney continued his questioning:

Q   Did you want to go down to that car?
    MR. SHIELDS: Objection, your Honor.
    THE COURT: Overruled.

A   I wanted to do what my sister told me to do.

Q   And still neither you nor Mr. Mitchell said anything about the car being down there. Isn't that correct?

A   No.
    MRS. POSWISTILO: Objection, your Honor, same reason.
    MR. SHIELDS: I join in that objection.
    THE COURT: Overruled.

N.T. 330.

In closing to the jury, the district attorney commented on Johnson's and appellant's confrontation with the police in the schoolyard: "Why didn't the defendants tell the police at the scene, when they were stopped?" "Why didn't they say why they were in the area?" "Why didn't he tell the officer why he was there?" Defense counsel objected to all of these comments but the trial judge overruled the objections.

Appellant argues that the district attorney's cross-examination and comments in closing argument constituted impermissible references to his right to remain silent. I agree and therefore should reverse and order a new trial.

It is settled that it is reversible error for the trial judge to permit the prosecutor to refer to or comment upon an accused's silence at trial or at the time of arrest. *See Commonwealth v. Easley*, 483 Pa. 337, 396 A.2d 1198 (1979); *Commonwealth v. Greco*, 465 Pa. 400, 350 A.2d 826 (1976); *Commonwealth v. Stafford*, 450 Pa. 252, 299 A.2d 590 (1973); *Commonwealth v. Haideman*, 449 Pa. 367, 296 A.2d 765 (1972); *see Commonwealth v. Maloney*, 469 Pa. 342, 365 A.2d 1237 (1976) (plurality opinion). The references and comments concerned appellant's silence on the night of the crimes, which was several days before he and Johnson were arrested. This fact, however, makes no difference, as is apparent once the reason for the rule against reference to an accused's silence is understood.

"The prohibition of any reference to an accused's silence reflects the court's desire that an accused not be penalized for exercising his constitutional rights. . . . It is a recognition that most lay persons would view an assertion of the constitutional privilege [to remain silent] as an admission of guilt. *Commonwealth v. Greco, supra*, 465 Pa. at 404, 350 A.2d at 828 (citations omitted). The "recognition that most lay persons would view [silence] as an admission of guilt" is another way of expressing the fear that the jury will consider an accused's silence in the face of an accusation by police as a tacit admission of guilt, and in that way penalize the accused for exercising the right to remain silent. It is the strength, or realism, of this fear, in recognizing what "most lay persons" are likely to do, that requires careful adherence to the rule barring any reference to the accused's silence. When the police arrest and charge a defendant with a crime, he is entitled to remain silent; but if the jury hears that the defendant was silent, they will likely view the silence as an admission of guilt on the premise "that the natural reaction of an innocent person would be a denial of any involvement in the crime charged." *Commonwealth v. Greco*, 465 Pa. at 404, 350 A.2d at 828. Thus, in *Commonwealth ex rel. Shadd v. Myers*, 423 Pa. 82, 85, 223 A.2d 296, 298 (1968), the Supreme Court overruled a

long line of cases that had held evidence of the accused's silence at arrest admissible as a tacit admission. The use of such tacit admissions, the Court held, represented an improper penalty on the accused's right to remain silent.

Since the reason for the rule against any reference to or comment upon the accused's silence is to prevent the jury's inferring a tacit admission, it makes no difference whether the silence occurs before or after a formal arrest or before or after *Miranda* warnings have been given. Thus in *Commonwealth v. Easley, supra,* the Supreme Court stated that "we do not believe any reason exists to differentiate between situations where the right to remain silent is exercised following warnings and where it is exercised without warnings being given." 483 Pa. 341–342 n.5, 396 A.2d at 1200–01 n.5. The Court therefore held that comment on the defendant's refusal to speak to police on the scene before he was given his *Miranda* warnings was improper. Similarly, in *Commonwealth v. Gochenaur,* 234 Pa.Super. 588, 341 A.2d 163 (1975), this court held improper a reference to the defendant's silence in response to police questioning some four days before the defendant was arrested. The situation here differs in that in *Gochenaur* the defendant had been warned of his rights and had chosen to remain silent while in custody at the police station, but these differences are not significant. The significant fact is not whether *Miranda* warnings have been given, or whether there has been a formal arrest, or whether the police accusation occurs at the station house, or whether as here, and as in *Easley,*[1] it occurs on the scene of the crime. The significant fact is whether there has been an accusation by the police.[2] It is silence in

---

1. While the Supreme Court in *Easley* spoke of the defendant's silence "at the time of arrest", it should be noted that it appears that the defendant in that case chose to remain silent before he was actually formally placed under arrest. Indeed, the defendant's testimony as reprinted in the Supreme Court's opinion was that "[w]hen the police stopped me they said 'Halt,' and one officer said, 'Well, that's him,' or something like that there. And so, you know, I didn't say anything to them?" 483 Pa. at 341 n.4, 396 A.2d at 1200 n.4.

2. Evidence of the defendant's silence when accused of a crime by someone unconnected with the police would perhaps not be barred

the face of an accusation that creates the danger of a tacit admission. In fact, if there were no accusation, the silence would not be probative of guilt at all. Thus, in any case where the police accuse a person of criminal wrongdoing, that person's silence in response to that accusation should not be admitted against him. He has no duty to answer the police accusation.

The question in this case therefore is whether the district attorney's references to silence, both on cross-examination of Johnson and in the closing argument, were references to appellant's silence in the face of a police accusation. If they were, the trial judge should have granted appellant's motion for a mistrial to prevent the jury from improperly treating the silence as a tacit admission of guilt.

When the district attorney first began to question Johnson with respect to the conversation he and appellant had had that night with the police, Johnson answered that appellant had told Officer Otranto that they were taking a shortcut. That statement by appellant was responsive to the officer's question, "What are you doing here?" Johnson explained appellant's failure to say more by saying that the officer "didn't ask" for any further explanation. The district attorney then proceeded to elicit from Johnson an admission that he and appellant knew that the officers were investigating a burglary at the school. ("The officer also told you why he was checking you out. Did he not? That there had been a burglary at the school.") The district attorney's ensuing "question"—it was in fact not a question but a statement—that "Neither of you said anything about that [going to fix the green Pontiac"], was an undisguised invitation to the

by the rule prohibiting evidence of or comment upon a defendant's silence. *See Commonwealth v. Schmidt*, 452 Pa. 185, 299 A.2d 254 (1973) (silence during incriminating conversation in automobile with no police present). If the accusation is by a third party in the presence of the police, however, the rule will apply. *See Commonwealth ex rel. Shadd v. Myers, supra* (police read confederate's accusations to accused in confederate's presence); *Commonwealth v. Wetzel*, 214 Pa.Super. 536, 257 A.2d 310 (1969) (prosecutrix identifies defendant in police presence; evidence that defendant said nothing and hung his head impermissible tacit admission).

jury to infer a tacit admission of guilt. The district attorney's point, which the jury could not have failed to grasp, was that since appellant and Johnson knew that the officer was "checking [them] out" concerning the burglary, they should, *if they were innocent*, have volunteered a fuller explanation of their presence.

The Commonwealth's argument that the district attorney was only attempting to show a contradiction between appellant's statement to the officers, "We are taking a shortcut", and Johnson's statement at trial, that he and appellant were going to check on his sister's Pontiac, is without merit. In the first place, Johnson's statement at trial did not in any way contradict appellant's statement on the scene. (They could have been taking a shortcut to get to the Pontiac.) But in the second place, and more important, the district attorney's comments in closing argument demonstrate that he was not interested in a (non-existent) contradiction but in urging the jury to infer a tacit admission of guilt on the basis of appellant's and Johnson's silence at the scene of the crime.

In *Commonwealth v. Dulaney*, 449 Pa. 45, 295 A.2d 328 (1972), the Supreme Court was confronted with a similar situation. There, the defendant at arrest told the police that he had stabbed the victim, but he refused to say anything more. Later, at trial, the defendant claimed that he had acted in self-defense. The district attorney commented on the defendant's failure to tell the police when arrested that he had acted in self-defense. In holding these comments improper, the Supreme Court stated that the defendant's statement that he had stabbed the victim was not a waiver of his right to remain silent thereafter, and that his silence after he admitted the stabbing did not amount to a contradiction of his claim at trial that he had acted in self-defense. Here, similarly, Johnson's silence at the scene represented no contradiction of his explanation at trial.

I should therefore reverse and grant appellant a new trial.

PRICE, Judge, dissenting:

I would affirm the judgment of sentence since I believe appellant's arguments lack merit.

VAN der VOORT, Judge, dissenting:

It appears to me that it is crystal clear that the appellant participated in the burglary involved in this case.

I find no merit in the claims of error made by the appellant. I respectfully dissent and would affirm the judgment of sentence.